Submitted August 26, 2010, affirmed April 20, 2011

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

DANIEL C. J. COURTNEY,
*Defendant-Appellant.*

Multnomah County Circuit Court
080130290; A139791

255 P3d 577

Peter Gartlan, Chief Defender, and Zachary Lovett Mazer, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

John R. Kroger, Attorney General, Jerome Lidz, Solicitor General, and Anna M. Joyce, Assistant Attorney General, filed the brief for respondent.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Landau, Judge pro tempore.

SERCOMBE, J.

## SERCOMBE, J.

Defendant appeals from a judgment of conviction on one count of unlawful possession of methamphetamine, ORS 475.894, and assigns error to the trial court's denial of his motion to suppress evidence. Defendant, who was a passenger in a car that was stopped for a traffic violation, argues that he was unlawfully seized in violation of Article I, section 9, of the Oregon Constitution either as the result of an unlawful extension of the traffic stop or because he subjectively believed that he was not free to exit the car without police permission and that belief was objectively reasonable.[1] Accordingly, defendant argues that all evidence obtained as a result of his unlawful seizure should have been suppressed, including two methamphetamine pipes, various admissions, and the methamphetamine discovered in his shoe as a result of those admissions. The state responds that defendant was not unlawfully seized and, alternatively, that, even if defendant was illegally detained, the evidence he seeks to suppress did not derive from that illegality. Although we conclude that defendant was unlawfully seized in violation of Article I, section 9, we nonetheless affirm the decision of the trial court because defendant has failed to establish the existence of a minimal factual nexus between the discovery of the methamphetamine pipes and the unlawful police conduct, and defendant has not advanced any argument that, absent a factual link provided by the discovery of the pipes, there is a minimal factual nexus between his unlawful seizure and the remaining evidence he seeks to suppress.

## I.  HISTORICAL FACTS

We review the trial court's denial of defendant's motion to suppress for errors of law. ORS 138.220. The trial court's findings of historical fact are binding on appeal if there is sufficient evidence in the record to support them. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). "If findings of historical fact are not made on all pertinent issues and there is evidence from which such facts could be decided more than one way, we will presume that the facts were decided in

---

[1] Article I, section 9, provides, in part, "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]"

a manner consistent with the court's ultimate conclusion." *Id.* (citation omitted). In this case, the trial court made extensive findings of fact at the hearing on the motion to suppress. The following facts are taken from those findings or are otherwise consistent with the trial court's ultimate conclusion and supported by evidence.

Just after midnight on January 13, 2008, a Portland police officer, Stenzel, observed a car being driven with only one tail light. Stenzel initiated a stop of the vehicle and called in the car's license plate to dispatch; Stenzel then proceeded to make contact with the driver, Bennett. Defendant was seated in the front passenger seat; there was also a second passenger seated in the back seat. Not long after the stop was initiated, a second officer (the cover officer) arrived on the scene.

Stenzel requested Bennett's license, registration, and insurance information. Bennett told Stenzel that his license was suspended and provided Stenzel with an Oregon identification card instead. Stenzel ran Bennett's identification and discovered that Bennett's license was actually revoked. Stenzel then cited Bennett for driving while revoked and, as required by Portland Police Bureau policy, he ordered a mandatory vehicle tow for Bennett's car. Thereafter, Stenzel recontacted Bennett to remove him from the car in order to prepare the car for the tow.

Because Stenzel patrols a high crime area, his regular practice when asking an individual to step out of a vehicle is to first ask if the individual has any weapons. Stenzel then asks for consent to search the person for weapons. Following those inquiries, Stenzel asks the person to place the person's hands on top of the person's head, with the fingers interlaced, and for the person to lean his or her body forward and turn slightly away from him. Stenzel then takes control of the person's hands and has the person stand up from the car.

In this case, Stenzel followed his regular practice when removing Bennett from the car; the patdown of Bennett revealed nothing of concern. Afterward, Stenzel took Bennett to the sidewalk, delivered the citation, and explained that he had to tow the car. Stenzel told Bennett that he "was going to

get the passengers out so that [he] could perform an * * * inventory of the vehicle per the policy" and that, afterward, Bennett would be allowed to return to the car and remove anything he wanted to take with him. While Stenzel talked with Bennett on the sidewalk, the passengers remained seated in the car with the windows slightly cracked. At some point during the encounter, Stenzel "nonchalantly or casually" told the passengers something like "stay there, I'll be with [you] in a minute" or "I'll be with you in a second." Defendant testified at the suppression hearing that he did not feel that he "was allowed to exit the vehicle without permission."

After conversing with Bennett, Stenzel left him on the sidewalk near the cover officer. Stenzel then went to the rear of the vehicle, contacted the passenger in the back seat, told him the car was being towed, and went through his regular practice of asking about weapons, asking for consent to search for weapons, and directing the manner in which the back seat passenger exited the car. As with Bennett, the pat-down of the back seat passenger revealed nothing of concern, and that passenger eventually joined Bennett on the sidewalk near the cover officer.

Stenzel then began to converse with defendant, who was seated in the front seat. Stenzel engaged in essentially the same conversation with defendant that he had with Bennett and the back seat passenger, although he may not have told defendant that the car was being towed. Stenzel asked defendant if he had any weapons; defendant said that he did not. Stenzel also asked defendant for consent to search him for weapons; defendant gave his consent. Stenzel then instructed defendant to place his hands on top of his head and interlace his fingers; defendant did so. As Stenzel opened the car door to remove defendant to facilitate the tow of the car, however, a clinking sound drew his attention to the "running board"—what Stenzel described as an interstitial space on the floor of the car between where the passenger seat ends and the door begins. Two glass pipes that were originally in the door had "teeter-totter[ed] * * * as the door was pulled open," flipped out of the area they were sitting in, and landed near the running board, by the seat. The pipes were clear

glass tubes with noticeable residue; Stenzel recognized the pipes to be methamphetamine pipes and believed he had probable cause to arrest defendant.

While defendant was still seated in the car, Stenzel immediately advised defendant of his *Miranda* rights. Stenzel asked defendant if he understood his rights; defendant responded that he understood. Stenzel then asked defendant about the pipes; defendant said that he had smoked the "stems" earlier, by which he meant the tube part of the pipe. Stenzel asked defendant if he had any methamphetamine on his person; defendant denied having any.

Stenzel took defendant into custody approximately 18 minutes after initiating the traffic stop. Stenzel had spent the majority of that time—about 14 minutes—dealing with the driver; the remaining four minutes were spent interacting with the back seat passenger and defendant. Sometime after taking defendant into custody, when Stenzel was transporting defendant to the jail, Stenzel had a conversation with defendant about entering the jail with contraband. Defendant then admitted to having "stuff" in his shoe. Stenzel asked defendant if "stuff" meant methamphetamine; defendant said yes. Stenzel checked defendant's shoe and found a crinkled up piece of paper wrapped around a small plastic baggie of clear crystals. Stenzel field tested the substance, and it tested positive for methamphetamine. Ultimately, defendant was charged with one count of unlawful possession of methamphetamine.

## II.  PROCEDURAL HISTORY

Prior to trial, defendant moved to suppress all evidence obtained in violation of various provisions of the state and federal constitutions, including Article I, section 9, of the Oregon Constitution. In his written motion, defendant argued that he had been unlawfully detained without reasonable suspicion and that any evidence derived from that illegality should be suppressed. At the hearing on the motion, the state argued that defendant had not been unlawfully seized, and that, even if the state was wrong on that point, defendant could not establish a factual nexus between the

unlawful seizure and the discovery of the evidence, the evidence was in plain view, the evidence would have been inevitably discovered in an inventory of the car pursuant to Portland City Code 14C.10.030, and defendant was not compelled into making the statements about the methamphetamine in his shoe after he was given the *Miranda* warnings. In response, defendant again contended that he had been unlawfully seized without reasonable suspicion and also argued that the state had failed to lay a foundation for inevitable discovery by inventory.

The trial court ultimately denied defendant's motion to suppress, concluding, in part, that

"I think the defendant falls into the category of passengers who are—are lawfully detained pursuant to a legitimate stop of the driver for a—a violation.

"The officer has the right to tow. It's—it's not discretionary when someone is suspended or revoked, they have to tow the vehicle, and thus, the people have to get out of the vehicle in order for it both to be towed and for an inventory search to be done.

"* * * * *

"* * * I think the officer * * * can ask consent for a patdown, and because he both asked for a consent and received it and because he had the right to ask them to get out of the car pursuant to the tow, the way the defendant came to be exiting the car, it really doesn't matter what kind of hold he was in or anything else. The fact was he was coming out both by virtue of consent and by necessity for the tow.

"And then there is * * * a plain view of the pipes, and so it really wasn't anything that the police officer did unlawfully that got him a vantage point to see the two pipes, and thus, the viewing of the pipes was lawful. And upon seeing them, seeing them in their condition, he had probable cause to arrest [defendant], and everything that flowed from there was then okay."

Defendant was later convicted following a trial on stipulated facts.

## III. DISCUSSION

On appeal, defendant begins by renewing the arguments he made below. In particular, defendant contends that he was unlawfully seized under Article I, section 9, as interpreted in *State v. Hall*, 339 Or 7, 17, 115 P3d 908 (2005) (seizure occurs when a person subjectively believes that an officer has deprived him of his freedom of movement and that belief is objectively reasonable). According to defendant,

> "[w]hen [he] watched Bennet[t] and [the back seat passenger] exit [the car] only after agreeing to a patdown search and engaging in the officer's 'controlled exit' procedure, it was perfectly reasonable for him to believe that he was not free to exit until he similarly had gone through the officer's procedures."

Defendant argues that the minimal factual nexus between the unlawful police conduct and the discovery of the evidence against him is "clear"—that Stenzel's decision to question the occupants of the car about weapon possession, request consent to perform a patdown search, and take control of each individual's hands before exiting the car, "physically put [Stenzel] in the position where he was standing at defendant's door, and indeed opening the door itself, which is when he observed the pipes."

The state responds that defendant was not unlawfully seized by the questions posed to him by Stenzel. The state argues that, where a defendant is a mere passenger, a traffic stop does not, without more, render a passenger seized for purposes of Article I, section 9. Thus, the state contends that the relevant issue is "whether any actions the officer took during the course of [the] lawful traffic stop with respect to defendant caused defendant to be 'seized.' " The state then frames the encounter in this case as one of mere conversation, arguing that

> "Stenzel's single question about whether he could check for weapons was brief, it occurred in the context of asking defendant to get out of the car so that the officer could tow it, and it was akin to the type of non-coercive 'mere conversation' that does not implicate Article I, section 9."

Among its alternative arguments, the state contends that defendant's asserted error on appeal fails because defendant cannot show that, but for the question about weapons and request for consent to search, Stenzel would not have seen the pipes, *i.e.*, that defendant has failed to satisfy the minimal factual nexus between the unlawful police conduct and the evidence he seeks to suppress.

For the reasons that follow, we conclude that, during the traffic stop, defendant was unlawfully seized in violation of Article I, section 9. However, because we also conclude that defendant has failed to establish the existence of a minimal factual nexus between the discovery of the methamphetamine pipes and the unlawful police conduct and because defendant has not advanced any argument that, absent a factual link provided by the discovery of the pipes, there is a minimal factual nexus between his unlawful seizure and the remaining evidence he seeks to suppress, we affirm.

A. *Lawfulness of the police encounter with defendant*

The Supreme Court in *State v. Ashbaugh*, 349 Or 297, 308-09, 244 P3d 360 (2010), recently summarized the manner in which citizen encounters with police are analyzed under Article I, section 9:

"We long have recognized that, out of the broad range of potential encounters between police and citizens, only some implicate the prohibition in Article I, section 9, against unreasonable 'seizures.' We have divided police-citizen encounters, very roughly, into three categories: (1) 'mere conversation,' that is, noncoercive encounters that are not 'seizures' and, thus, require no justification under Article I, section 9; (2) 'stops,' a type of seizure that involves a temporary restraint on a person's liberty and that violates Article I, section 9, unless justified by, for example, necessities of a safety emergency or by reasonable suspicion that the person has been involved in criminal activity; and (3) 'arrests,' which are restraints on an individual's liberty that are steps toward charging individuals with a crime and which, under Article I, section 9, must be justified by probable cause to believe that the arrested individual has, in fact, committed a crime. The thing that distinguishes 'seizures'—that is, 'stops' and 'arrests'—from encounters that are 'mere conversation' is the imposition, either by

physical force or through some 'show of authority,' of some restraint on the individual's liberty. *State v. Rodgers/ Kirkeby*, 347 Or 610, 621-22, 227 P3d 695 (2010); *see also State v. Warner*, 284 Or 147, 161-62, 585 P2d 681 (1978) (to the same effect)."

Here, the state does not argue that Stenzel had reasonable suspicion or probable cause to believe that defendant had committed a crime prior to the discovery of the methamphetamine pipes. Nor does the state contend that Stenzel's conduct toward defendant was supported by reasonable officer safety concerns. *See State v. Foster*, 347 Or 1, 8, 217 P3d 168 (2009) (" 'Article I, section 9, * * * does not forbid an officer to take reasonable steps to protect himself or others if, during the course of a lawful encounter with a citizen, the officer develops a reasonable suspicion, based upon specific and articulable facts, that the citizen might pose an immediate threat of serious physical injury to the officer or to others then present.' " (quoting *State v. Bates*, 304 Or 519, 524, 747 P2d 991 (1987))). Therefore, as correctly framed by the state, the first issue in this case is whether Stenzel engaged defendant in "mere conversation," rather than having restrained or "seized" defendant in the constitutional sense.

■    As refined by the court in *Ashbaugh*, whether a person has been "seized" for purposes of Article I, section 9, is determined using an entirely objective, rather than partially subjective, test:

> "A 'seizure' of a person occurs * * * (a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) if a reasonable person under the totality of the circumstances *would* believe that (a) above has occurred."

349 Or at 316 (emphasis in original). Accordingly, in this case, that defendant himself subjectively believed he was not free to exit the car without police permission is not determinative of whether defendant was "seized" under Article I, section 9.

In *State v. Amaya*, 336 Or 616, 630-31, 89 P3d 1163 (2004), the Supreme Court explained:

"It is a truism that all passengers in a validly stopped car have been 'stopped,' at least physically. However, such a stop is not a 'seizure' of those passengers for constitutional purposes. * * * It also is true that an officer may take reasonable steps respecting the passengers, including, for example, asking the passengers to exit the vehicle so the officer may search the vehicle, assuming that the driver has consented to the search or that it otherwise is justified. However, an officer's further exercise of coercive authority over the passengers after they are out of the vehicle may, in certain circumstances, constitute a seizure."

Recently, in *State v. Smith*, 236 Or App 5, 237 P3d 853 (2010), we regarded that statement by the court in *Amaya* as

"reflecting its view that, if a person who knows that the vehicle he or she occupies is about to be searched and is asked to step out of the vehicle in order to allow the search to proceed, merely asking the person to step out of the vehicle would not lead an objectively reasonable person to believe that he or she had been 'seized.' "

236 Or App at 12.

The defendant in *Smith* was a passenger in a car that was subject to mandatory towing. *Id.* at 7. However, in that case, the defendant's encounter with the police involved more than a mere request to exit the vehicle. There, an officer (1) initially asked the defendant for his name and wrote it down; (2) approached the defendant a second time and asked the defendant to step out of the car; and (3) while the defendant was stepping out of the car, questioned him about having anything he "shouldn't have." *Id.* at 12. In addition, there was no suggestion that either of two officers present at the scene had told the driver or the defendant that they were being asked to step out of the car to facilitate the towing of the car. Further, the evidence indicated that the driver had not yet been given the citation for the traffic violation that precipitated the traffic stop. Accordingly, we concluded that "[t]he 'totality' of [the] circumstances differ[ed] significantly from a situation where a vehicle's occupant is asked to step out in order to allow the officer to do something with the vehicle that is legitimately related to the traffic stop, or was consented to by the driver." *Id.*

We later further reasoned:

"First, * * * an officer's unexpressed reasons for approaching and questioning someone are 'simply not relevant' when the question is whether a reasonable person *in the defendant's position* could have believed that an officer had significantly restricted his or her liberty or freedom of movement. Thus, although in the present case, it appears that [the officer] had a valid reason related to the traffic stop for asking defendant to step out of the car (because [the officer] intended to have it towed), that reason was not expressed to defendant or the driver at the time defendant was asked to step out, and therefore, on this record, does not inform what a reasonable person in defendant's situation would have thought.

"Second, in this case, * * * there was a second officer on the scene. Third, * * * defendant was not told he was free to leave. Finally, * * * the officer immediately questioned defendant about contraband, rather than pursuing further inquiry or taking further action related to the traffic stop. * * * We thus conclude * * * that the 'objective' inquiry under [Article I, section 9,] leads to the conclusion that a person in defendant's position could have believed that his liberty and freedom of movement had been restricted and that that belief was objectively reasonable under the circumstances."

*Id.* at 14-15 (citations omitted; emphasis in original). In reaching that conclusion, however, we emphasized that there

"is no bright-line rule as to whether an officer's request that a person step out of a vehicle in the context of a traffic stop constitutes a seizure for purposes of Article I, section 9. Such a request is merely one of the factors that is part of the totality of the circumstances that must be evaluated."

*Id.* at 16; *cf. State v. Woods*, 134 Or App 53, 894 P2d 511, *rev den*, 321 Or 340 (1995) (the defendant, who was a passenger in a car stopped for a traffic violation, was not seized under Article I, section 9, where the officer informed the defendant that the car was going to be towed and asked the defendant to step out of the vehicle).

■    In this case, much like in *Smith*, several factors counsel in favor of concluding that a reasonable person in defendant's position would have believed that his or her freedom of

movement had been restricted by a police show of authority.[2] First, rather than telling defendant he was free to leave, Stenzel—however casually or nonchalantly—initially told both passengers in the car to stay where they were. Second, there were two officers at the scene, and, although the cover officer did not interact with defendant, his presence on the nearby sidewalk with Bennett and the back seat passenger is a relevant consideration when determining whether there was a show of police authority that restrained defendant's liberty. Third, although Stenzel had a valid reason related to the traffic stop for asking defendant to step out of the car (because Stenzel intended to have it towed), that reason may not have been expressed to defendant. Finally, and perhaps most significantly, Stenzel directed defendant to put his hands on top of his head, with his fingers interlaced—an order with which defendant complied.

The state, in its arguments on appeal, has focused exclusively on the character and context of Stenzel's question regarding consent to search for weapons. Were that indeed the only circumstance at issue, this case may have been a closer one. Here, however, the totality of the circumstances establishes that defendant's encounter with the police was well-removed from the noncoercive scenario that occurred in *Woods* or that was contemplated by the court in *Amaya*. Based on the foregoing, we conclude that, under the standard enunciated in *Ashbaugh*, a reasonable person in defendant's position would have believed, prior to the point at which the car door was opened, that his or her liberty and freedom of movement had been restricted. Defendant was seized in the constitutional sense.

## B. *Admissibility of the evidence*

The conclusion that defendant was unlawfully seized, however, does not end our inquiry in this case. The

---

[2] *Smith* was decided prior to the Supreme Court's decision in *Ashbaugh*. The factors ruled in *Smith* as related to "whether a reasonable person *in the defendant's position* could have believed that an officer had significantly restricted his or her liberty or freedom of movement," 236 Or App at 14 (emphasis in original), remain relevant to the test announced in *Ashbaugh* pertaining to whether "a reasonable person under the totality of the circumstances *would* believe" that such a restriction occurred. 349 Or at 316 (emphasis in original).

effect of an illegal detention on the admissibility of subsequently obtained evidence is determined under another analytical paradigm. In *Hall*, 339 Or at 24-25, the Supreme Court explained:

> "Although the aim of the Oregon exclusionary rule is to restore a defendant to the same position as if 'the government's officers had stayed within the law,' this court has rejected the notion that evidence is rendered inadmissible under Article I, section 9, simply because it was obtained after unlawful police conduct or because it would not have been obtained 'but for' unlawful police conduct. Instead, * * * *after a defendant establishes the existence of a minimal factual nexus—that is, at minimum, the existence of a 'but for' relationship—between the evidence sought to be suppressed and prior unlawful police conduct, the state nevertheless may establish that the disputed evidence is admissible under Article I, section 9, by proving that the evidence did not derive from the preceding illegality.* To make that showing, the state must prove that either (1) the police inevitably would have obtained the disputed evidence through lawful procedures even without the violation of the defendant's rights under Article I, section 9; (2) the police obtained the disputed evidence independently of the violation of the defendant's rights under Article I, section 9; or (3) the preceding violation of the defendant's rights under Article I, section 9, has such a tenuous factual link to the disputed evidence that that unlawful police conduct cannot be viewed properly as the source of that evidence.
>
> "In each of those above-described circumstances, the admission of the challenged evidence does not offend Article I, section 9, because the defendant has not been disadvantaged as a result of the unlawful police conduct or, stated differently, because the defendant is not placed in a worse position than if the governmental officers had acted within the bounds of the law. In short, suppression of evidence in such circumstances would not serve to vindicate the defendant's rights under Article I, section 9, because the evidence sought to be suppressed did not result from a violation of the defendant's rights under Article I, section 9."

(Citations omitted; emphasis added.)

The question of whether a defendant has met his or her burden to establish a minimal factual nexus between an

illegal detention and the evidence sought to be suppressed has arisen in a variety of contexts. Most recently, the Supreme Court addressed the issue in circumstances where the evidence was discovered following an unlawfully seized defendant's consent to search. In *State v. Ayles*, 348 Or 622, 631-32, 237 P3d 805 (2010), the court explained:

> "During defendant's unlawful seizure, defendant was not free to leave. The unlawful police conduct thus made defendant available to [the officer] for questioning. Although the state asserts that, as a practical matter, defendant would have remained at the scene regardless of the illegal seizure (because his driver had been lawfully stopped and the location of the stop was somewhat remote), the state has pointed to no evidence in the record that defendant would not have left had he not been illegally detained. * * * But our point is an even more fundamental one: Whether or not defendant would have asserted his personal liberty and left the scene once his identification was returned to him, we cannot conclude that the illegal seizure of defendant, *while it was ongoing*, had no factual nexus to defendant's decision to consent. A defendant gains nothing from having a constitutional right not to be seized if the police can seize him and—by definition—use the circumstance of that seizure as a guarantee of an opportunity to ask him to further surrender his liberty. There was a minimal factual nexus between defendant's illegal seizure and his decision to consent."

(Emphasis in original.) Further, the court noted:

> "[T]he state has cited no case, and our research discloses none, in which a court has found the *absence* of a minimal factual nexus between an unlawful seizure that is ongoing and a defendant's decision to consent to an officer's request to search. We think that the reason both that the court sometimes assumes without discussion that a defendant has shown the required nexus when consent occurs during an ongoing seizure and that no case exists holding that there is no minimum connection in such circumstances is that the existence of a minimal factual nexus is obvious in cases in which the defendant consents to a search (or takes other incriminating action) *during an illegal seizure*. That conclusion is reflected in this court's recent decision in *State v. Rodgers/Kirkeby*, 347 Or 610, 227 P3d 695 (2010). In that case, without any discussion or explanation, this court expressly concluded that the defendants in that case 'ha[d]

shown the required nexus' by showing that they consented to be searched during a period of unlawful detention. *Id.* at 629-30.

"To summarize, then, we agree with the state that the 'minimal factual nexus' standard is a true standard, not a resort to the logical fallacy, '*post hoc ergo propter hoc.*' However, a defendant establishes a more substantial connection than merely one thing occurring after another when that defendant establishes that he or she consented to a search *during* an unlawful detention. In such a circumstance, the fact that the defendant is not legally free to leave because of the illegal police activity cannot be discounted in motivating the defendant's consent and, therefore, such illegal police conduct normally will be at least minimally connected to the defendant's decision to consent."

*Id.* at 633-34 (footnote omitted; emphases in original); *see also State v. Huggett*, 228 Or App 569, 577, 209 P3d 385 (2009), *rev dismissed*, 348 Or 71 (2010) (concluding that, where the officer requested the defendant's consent to search, and discovered the relevant evidence, during the unjustified extension of the initial lawful stop, that was "sufficient to show the required nexus"); *State v. Chambers*, 226 Or App 363, 366, 373, 203 P3d 337 (2009) (the defendant, who was convicted of carrying a concealed weapon, had shown the requisite "but for" connection because the officer observed the concealed knife in the defendant's rear pants pocket when the defendant had leaned over during the unlawful seizure).

In addition to those cases where the defendant consents or engages in some other incriminating action during an unlawful seizure, we have also addressed the minimal factual nexus inquiry where the evidence is discovered as a result of investigatory police conduct that effectuates an unlawful seizure, rather than as a result of any action taken by an unlawfully detained defendant. In *State v. Backstrand*, 231 Or App 621, 628, 220 P3d 748 (2009), *rev allowed*, 350 Or 130 (2011), the lead opinion (Rosenblum, J.) concluded that, where the defendant, who had been convicted of misdemeanor driving while revoked, had voluntarily produced his identification card and given it to the officer before the unlawful stop began, the officer had not obtained evidence of

the defendant's identity as a result of the stop and, therefore, that identification evidence was not subject to suppression. However, Judge Rosenblum also concluded that, even though the defendant gave the officer his identification before the officer called the information in to dispatch, "but for the act of calling it in—the very act that effected the stop—[the officer] would not have known that [the] defendant's license had been revoked." *Id.* Accordingly, Judge Rosenblum further stated that, "but for the stop, none of the evidence (other than [the] defendant's identity) would have come to light. Therefore, [the] defendant established the necessary factual nexus between the stop and the evidence obtained after the stop began." *Id.*

■      The instant case presents a unique factual scenario. Unlike in *Ayles* or *Chambers*, defendant did not take any action, much less any incriminating action, while unlawfully seized that led Stenzel to discover the methamphetamine pipes. In addition, unlike in *Backstrand*, the discovery of the pipes was not due to any investigatory action taken by the police that effectuated defendant's unlawful seizure. Rather, Stenzel discovered the pipes after defendant was already seized, when he opened the passenger car door to remove defendant in preparation for the lawful tow.

■      We are mindful in this case not to resort to the logical fallacy disclaimed by the Supreme Court in *Ayles*: "the 'minimal factual nexus' standard is a true standard, not a resort to * * * '*post hoc ergo propter hoc.*' " 348 Or at 634. In other words, merely showing that one thing occurred after another—*i.e.*, a factual relationship based *only* on temporal proximity—does not satisfy the minimal factual nexus standard. More evidence of a "but for" relationship is needed. Where a defendant engages in some incriminating action while in the presence of the police because he or she is not free to leave, it is logical to presume (or not to discount) that the unlawful seizure played some role in the discovery of the evidence. Similarly, it is logical to conclude that, where the police discover evidence by virtue of investigatory actions that effectuate an unlawful seizure, the evidence would not have been discovered "but for" the unlawful police conduct. No such logical inference is implicated when, while an unlawful seizure is ongoing, the police discover evidence by their

own conduct undertaken for a lawful purpose and that conduct neither effectuates the unlawful seizure nor is investigatory in nature.

The only factual connection that we discern in this case between defendant's unlawful seizure and the discovery of the methamphetamine pipes is that the latter occurred after the former began and while the former was ongoing. It was Stenzel's own action in opening the car door, not any action of defendant's that precipitated the discovery of the pipes. That police conduct, however, neither effectuated defendant's unlawful seizure, nor was investigatory in nature. Instead, defendant was removed from the car so that it could be towed. That removal was unrelated to defendant's seizure. Defendant, who testified at the suppression hearing, has pointed to nothing else in the record that suggests that the unlawful seizure played a role in causing the pipes to fall into plain view—for example, that Stenzel opened the door in a uniquely forceful manner or that, had he not been seized, defendant would have acted to prevent the pipes from falling into view.

We emphasize that it will be the rare case where, although the evidence is discovered during an ongoing unlawful seizure, the satisfaction of the minimal factual nexus standard is not obvious. This is such a case. Given the absence of additional evidence in the record, we conclude that defendant has failed to meet his burden to demonstrate the existence of a minimal factual nexus between the discovery of the methamphetamine pipes and the unlawful police conduct; it was not error for the trial court to deny defendant's motion to suppress as to the pipes.

Further, defendant has not advanced any argument, either on appeal or before the trial court, that, absent a factual link provided by the discovery of the pipes, there is a minimal factual nexus between his unlawful seizure and the remaining evidence he seeks to suppress—*i.e.*, his various admissions and the methamphetamine discovered as a result of those admissions. Accordingly, we do not consider whether the trial court erred in denying defendant's motion as to that evidence.

Affirmed.