Argued and submitted June 25, 2020, reversed and remanded June 23, 2021

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

THOMAS GEORGE PROUTY,
*Defendant-Appellant.*

Clackamas County Circuit Court
17CR64408; A169110

492 P3d 734

Defendant appeals from a judgment of conviction for delivery of methamphetamine, possession of methamphetamine, and possession of heroin. He assigns error to the trial court's denial of his motion to suppress evidence that he contends was discovered as the result of the unlawful stop of defendant by two Oregon state troopers. The state argues that defendant's encounter with the troopers did not amount to a stop and that, if it did, the seizure was lawful under the officer-safety doctrine. *Held*: Defendant was seized under Article I, section 9, of the Oregon Constitution, and the seizure was not justified under the officer-safety doctrine, because the state failed to prove that the troopers had objectively reasonable beliefs that defendant posed a threat. Therefore, the trial court erred in denying defendant's motion to suppress.

Reversed and remanded.

Heather Karabeika, Judge.

Francis C. Gieringer, Deputy Public Defender, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Philip Thoennes, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Ortega, Presiding Judge, and Shorr, Judge, and Powers, Judge.

SHORR, J.

Reversed and remanded.

**SHORR, J.**

Defendant appeals from a judgment of conviction for delivery of methamphetamine, ORS 475.890; possession of methamphetamine, ORS 475.894; and possession of heroin, ORS 475.854. He assigns error to the trial court's denial of his motion to suppress evidence that he contends was discovered as the result of an unlawful seizure under Article I, section 9, of the Oregon Constitution.[1] The state argues that defendant was not seized and that, if he was, the seizure was lawful under the officer-safety doctrine. For the reasons discussed below, we conclude that, under the totality of the circumstances, defendant was seized prior to the discovery of the evidence he seeks to suppress, and that the seizure was not justified by officer-safety concerns. Consequently, we reverse and remand.

We review the denial of defendant's motion to suppress for legal error, and we are bound by the trial court's findings of historical fact if the evidence in the record supports them. To the extent that the court failed to make express findings on pertinent historical facts, we will presume that the court found those facts in a manner consistent with its ultimate conclusion. *State v. Maciel-Figueroa*, 361 Or 163, 165-66, 389 P3d 1121 (2017). We state the facts, which are undisputed, in accordance with that standard of review.

At around 3:00 a.m., Oregon State Trooper Nelson responded to a call complaining of unsafe driving on I-5. Nelson located the vehicle and observed that the driver was frequently speeding up and slowing down, driving over the speed limit, and "drifting side to side within the lane." From the manner of driving, Nelson believed that the driver was likely driving under the influence of intoxicants (DUII). At 3:17 a.m., Nelson activated the siren on his unmarked patrol vehicle and stopped the driver, who pulled over to the left shoulder of I-5 so that the vehicle was in the median between the north- and south-bound lanes of traffic.

---

[1] Defendant also argues that the stop was unlawfully extended under the Fourth Amendment to the United States Constitution. Because we conclude that defendant was unlawfully seized under Article I, section 9, we do not reach defendant's Fourth Amendment argument.

Nelson approached the driver's side of the car and asked the driver, Templeton, for her license and registration. Templeton had difficulty locating her registration and appeared "restless" and "overly talkative." From Templeton's behavior, Nelson suspected that Templeton was "under the influence of a stimulant." Nelson also asked defendant, who was seated in the front passenger seat, for identification. Nelson copied the information from defendant's license and returned the license to defendant before returning to his patrol car. Nelson testified that it was routine to "try to identify everybody on a traffic stop." He also did so because defendant was a potential witness to a DUII investigation. During that brief interaction with defendant, Nelson observed that defendant was "on the nod" and "docile."

At his patrol car, Nelson contacted dispatch to check Templeton's and defendant's warrant status. Nelson did not inform Templeton or defendant that he intended to check their warrant status. Neither Templeton nor defendant had any outstanding warrants, but defendant was flagged as an "armed career criminal" and his driver's license was suspended. After Nelson learned that defendant was listed as an "armed career criminal," Nelson was concerned that defendant might present a safety risk.

Nelson returned to Templeton's car and asked her to perform field sobriety tests (FSTs). Templeton agreed, and Nelson and Templeton moved to the front of Nelson's patrol car to conduct the tests. Nelson did not tell defendant that he was free to leave, or otherwise interact with defendant, who remained in the front passenger seat. Nelson testified that there was traffic on I-5 at that time, and that there was no "safe passage" to cross the freeway. According to Nelson, it would have been "extremely dangerous" to try to cross the freeway because of the heavy traffic and time of night.

At some point during the FSTs, Trooper Kendoll arrived to assist Nelson with the investigation. Nelson asked Kendoll to "keep an eye on" defendant. Kendoll walked up to the driver's side of the car and bent down to look at defendant through the driver's side window. After one or two minutes, Kendoll stepped back several feet and continued watching defendant from a standing position. Nelson asked Kendoll

to watch defendant "for officer safety" and because he was concerned that defendant "could possibly have a weapon or something to that effect."

Around 30 minutes after Nelson initiated the traffic stop, he arrested Templeton for DUII. Kendoll left his position near Templeton's car to assist with the arrest. Nelson decided to search Templeton's car because he believed there might be evidence of prior methamphetamine use inside. While the troopers walked back to the car, they discussed what to do with defendant, who was still sitting in the passenger seat. Nelson told Kendoll that he wanted "to make sure that [defendant] didn't stuff anything on his person because [Templeton was] high on meth." In response, Kendoll offered to "take [defendant] to the front of [Nelson's] car and search him." Nelson agreed and explained that he wanted "to make sure [defendant] didn't stuff anything anywhere in the car."

Nelson approached the driver's side of the car while Kendoll stood at the passenger door. Nelson asked defendant to "follow this other trooper's instructions" and to "step out for me." Instead of exiting the car, defendant asked Nelson why he was being questioned. In response, Nelson stated, "Why are you being questioned? I want you to step out of the car." Defendant complied, and Kendoll stood close to defendant as he exited the car. Kendoll testified that he stood next to defendant for safety reasons, to ensure that defendant would not step into traffic, and that defendant would not reach for any weapons. Nelson testified that defendant was free to leave at that time, however, he also stated that he would have stopped defendant from crossing the freeway for defendant's safety.

Kendoll closely escorted defendant to the front of Nelson's car. Kendoll told defendant that he was not under arrest but did not tell defendant that he was free to leave. At Nelson's car, Kendoll asked defendant to submit to a patdown for weapons. Defendant consented. During the patdown, Kendoll asked defendant about objects in defendant's pockets that "concerned [him]," but did not feel like weapons. Defendant told Kendoll that the items were a pack of

cigarettes and binoculars. Kendoll did not search the inside of defendant's pockets.

After the patdown, Kendoll watched defendant while Nelson continued his search of the car. Kendoll described his demeanor as "relaxed" and explained that he "didn't have any sense *** that [defendant] was a threat to [the troopers]." Defendant asked Kendoll for permission to sit on the ground and smoke a cigarette. Kendoll agreed. At some point while defendant was sitting on the ground, Kendoll saw defendant pull something out of his pocket and place it on the ground. Kendoll did not know what the object was and he did not attempt to inspect it or ask defendant what it was.

Meanwhile, Nelson had searched the driver's side, backseat, and trunk of the car. Several minutes after the patdown, Nelson started searching the passenger's side. Under the passenger's seat, he found a box that held a methamphetamine pipe and a small plastic bag with a gas mask emblem printed on it. The plastic bag contained methamphetamine and heroin. Nelson also searched a backpack that was sitting on the floor in front of the passenger seat. Inside the backpack, Nelson found more methamphetamine, drug paraphernalia, and defendant's wallet.

A short time later, defendant asked Kendoll if he could leave the scene. Kendoll approached Nelson, who was still searching the passenger's side, to ask if defendant was free to go. Nelson told Kendoll that defendant was not free to leave because of the items that Nelson had discovered in defendant's backpack and under the passenger seat.

The troopers returned to Nelson's car where defendant was sitting. At that point, Nelson observed several items next to defendant on the ground. Among those items were plastic bags containing methamphetamine and heroin, including plastic bags with the same gas mask emblem as the bags discovered in the car. Kendoll told Nelson that defendant had pulled those items from his pocket while he was sitting on the ground. Just after 4:00 a.m., Nelson arrested defendant for possession of methamphetamine and heroin. Eventually Nelson issued a citation to defendant, and Kendoll drove defendant to a nearby truck stop.

Before trial, defendant moved to suppress the evidence discovered during the course of the traffic stop and resulting investigation, arguing that he was unlawfully seized in violation of Article I, section 9, and the Fourth Amendment to the United States Constitution. The trial court denied defendant's motion, concluding that defendant was not stopped at any point prior to the discovery of the evidence that defendant sought to suppress. The court reasoned that neither Nelson's momentary retention of defendant's license nor check of defendant's warrant status constituted a stop. And, Nelson's request for defendant to exit the car was "consistent with the trooper's rightful ability to have [defendant] step out of the vehicle so that [Nelson] safely could conduct the search incident to arrest." The court also determined that Kendoll's interactions with defendant did not amount to a stop because those interactions were relaxed. To the extent that Kendoll provided guidance to defendant as he exited the car, the court explained, those actions were taken for the troopers' and defendant's safety, given the time of night and location of the stop.

Defendant appeals, assigning error to the trial court's denial of his motion to suppress. Defendant contends that he was stopped by the time Kendoll requested defendant's consent to perform the patdown. The state contends that defendant was not stopped, and that, if he was, that seizure was lawful because it was motivated by officer-safety concerns. The state does not contend that the purported stop was justified by reasonable suspicion of criminal activity. We first determine whether defendant was seized, as defendant contends, when Kendoll asked defendant to consent to the patdown.

Article I, section 9, guarantees individuals the right to be "secure in their persons *** against unreasonable search, or seizure." Only some police-citizen encounters trigger the protections guaranteed by that constitutional provision. *State v. Backstrand*, 354 Or 392, 398-99, 313 P3d 1084 (2013). "At one end of the continuum are mere encounters for which no justification is required," and at the other end lie arrests "which involve protracted custodial restraint and require probable cause." *Id*. at 399. In between are "temporary detentions for investigatory purposes," or "stops,"

which "require reasonable suspicion." *Id*. Arrests and stops are seizures that implicate the protections of Article I, section 9, whereas mere encounters are not. *Id*.

A police-citizen encounter is a seizure, if "a reasonable person [would] believe that a law enforcement officer intentionally and significantly restricted, interfered with, or otherwise deprived the individual of his or her liberty or freedom of movement." *Id*. That inquiry is "fact-specific and requires an examination of the totality of the circumstances involved." *Id*. "The question for the court is whether the circumstances as a whole transformed the encounter into a seizure, even if the circumstances, individually, would not create a seizure." *State v. Newton*, 286 Or App 274, 280, 398 P3d 390 (2017) (internal quotation marks omitted).

Passengers in a stopped vehicle are not seized merely by virtue of their status as passengers. *State v. Ross*, 256 Or App 746, 754, 304 P3d 759 (2013). Rather, for a passenger to be seized, "some further show of authority directed at the passenger is required." *State v. Graves*, 278 Or App 126, 132, 373 P3d 1197, *rev den*, 360 Or 465 (2016). Generally, that show of authority must be "something more than just asking a question, requesting information, or seeking an individual's cooperation." *Backstrand*, 354 Or at 403. That is, "[e]xplicitly or implicitly, an officer must convey to the person with whom he is dealing, either by word, action, or both, that the person is not free to terminate the encounter or otherwise go about his or her ordinary affairs." *Id*. at 401. However,

> "when the content of the questions, the manner of asking them, or other actions that police take (along with the circumstances in which they take them) would convey to a reasonable person that the police are exercising their authority to coercively detain the citizen, then the encounter rises to the level of a seizure, the lawfulness of which must be analyzed as such."

*Id*. at 412.

We conclude that, under the totality of the circumstances, defendant was seized at the time that Kendoll asked defendant to consent to the patdown. We discuss the factors that lead us to that conclusion below. We emphasize

that, although no single act of the troopers may have consti-tuted a seizure of defendant, we do not view each action or the surrounding circumstances in isolation but analyze the encounter as a whole.

Before we begin our discussion of the troopers' con-duct, we note that the location and timing of the encounter provide context for that discussion. The encounter took place late at night, on the inner median of I-5, such that there was highway traffic on either side of defendant and the troopers. Nelson testified that there was no safe passage across the freeway because traffic was heavy. Although our analyti-cal focus is primarily on the troopers' conduct, the location and timing of the encounter provide context in determining the coerciveness of the conduct at issue. *Id.* ("the content of [an officer's] questions, the manner of asking them, or other actions that police take (*along with the circumstances in which they take them*)" can convey that the police are exer-cising their authority to coercively detain a citizen (empha-sis added)); *Newton*, 286 Or App at 281-83 (considering loca-tion and time of night in analysis of whether the defendant was seized). We begin our analysis with that context in mind.

Here, defendant was not seized during his initial interaction with Nelson. Apart from briefly requesting and retaining defendant's identification, Nelson did not commu-nicate with defendant at all during his investigation of the driver. *See Backstrand*, 354 Or at 416-17 (an officer's request for and verification of identification does not amount to a seizure absent an additional show of authority). However, the encounter became increasingly coercive after Kendoll arrived on the scene. *State v. Courtney*, 242 Or App 321, 333, 255 P3d 577, *rev den*, 351 Or 401 (2011) (the presence of two officers at the scene was a relevant consideration in determining whether there was a show of authority that restrained the defendant's liberty). At that point, Kendoll approached the driver's side of the vehicle across from where defendant sat in the front passenger's seat. Kendoll bent down to look directly through the window at defendant where he watched from that position for one to two minutes, and then continued to watch him from a standing position until Nelson arrested the driver. That observation, during

an ongoing DUII investigation, communicated to defendant that the troopers were monitoring his location and behavior.

The coercive tone of the encounter further increased when Nelson ordered defendant to exit the car. Although that order alone may not constitute a seizure here, it bears on our analysis in combination with other circumstances. *State v. Cline*, 264 Or App 293, 298-99, 330 P3d 1255 (2014) ("an officer's act of directing a person to alter the person's course of travel or to otherwise direct the person's movements may often constitute a 'show of authority' that effectuates a seizure" depending on "the context of the encounter in which [the directive] was made"). When Nelson first asked defendant to exit the car, defendant responded by asking why he was being questioned. Instead of explaining to defendant why he was being asked to exit the vehicle, Nelson repeated the order. *Courtney*, 242 Or App at 333 (although officer had valid reason for asking the defendant to step out of the car, the fact that that reason may not have been communicated to the defendant weighed in favor of concluding that the defendant was seized). Nelson had just arrested defendant's companion, and, from defendant's question, it was clear that defendant believed that he was enmeshed in the troopers' investigation. A reasonable person in defendant's position would understand from Nelson's response that Nelson's order was not a routine request in effectuating a search, but instead confirmed that defendant was part of the investigation. *State v. Charles*, 263 Or App 578, 587-88, 331 P3d 1012 (2014) (based on officer's disregard of the defendant's wife's explanation for crashed vehicle and request to speak to the defendant outside, a reasonable person would conclude that he "was the subject of a criminal investigation" which weighed in favor of conclusion that the defendant was seized).

In addition, when Nelson ordered defendant out of the car, he also told defendant to follow Kendoll's instructions. A person in defendant's position would not reasonably believe that he could walk away from the encounter unless he was given permission by Kendoll. *See State v. Ruiz*, 196 Or App 324, 327, 101 P3d 824 (2004), *rev den*, 338 Or 363 (2005) (order to remove hand from pocket was seizure

because person in the defendant's position would not reasonably believe that he could walk away from encounter without first removing hand from pocket).

The troopers' physical positioning was another circumstance that factors significantly in our analysis. Nelson stood at the driver's side door while he ordered defendant out of the car, and Kendoll stood at the passenger door. In effect, defendant was surrounded. *State v. Rodgers/Kirkeby*, 347 Or 610, 627, 227 P3d 695 (2010) (first officer's presence at the driver's side window and second officer's presence at the passenger's side of the car "was a sufficient 'show of authority' that, in combination with the unrelated questions concerning the items in the car and the request to search the car," resulted in a seizure of the defendant). And, when defendant got out of the car, Kendoll was waiting at the passenger door. Kendoll stood very close to defendant as he exited, and he guided defendant toward the front of Nelson's car, effectively controlling where defendant moved. A reasonable person would view those actions as a significant restriction on the person's freedom of movement.

Finally, Kendoll's request for consent to conduct the patdown, considered in context, communicated to defendant that he was not free to go. *Charles*, 263 Or App at 588 (in context, request to perform patdown implied that it was necessary because the defendant would remain in the officer's presence for some time). *State v. Stevens*, 364 Or 91, 103, 430 P3d 1059 (2018) (when the officer asked for the defendant's consent to search her backpack when she was about to walk away, "his question communicated that she was not free to go"). Given the troopers' earlier conduct—including Nelson's nonresponse to defendant's question why he was being questioned, Nelson's directive to follow Kendoll's instructions, and Kendoll's control of defendant's movements as he exited the car—Kendoll's request conveyed to defendant that he was "not free to terminate the encounter or otherwise go about [his] ordinary affairs." *Backstrand*, 354 Or at 401.

The state argues that defendant was not seized at the time that Kendoll asked to patdown defendant, citing several cases that, in the state's view, stand for "the well-established principle that a passenger is not seized when

asked to step out of a vehicle, even when the police ask the passenger potentially incriminating questions or ask for consent to search." *See, e.g.*, *State v. Parker*, 266 Or App 230, 238-39, 337 P3d 936 (2014) (the defendant passenger was not seized when officer asked him to step out of the truck, asked if he had weapons, and sought his consent to search); *State v. Dudley*, 245 Or App 301, 306-07, 263 P3d 1054 (2011), *rev den*, 354 Or 838 (2014) (the defendant passenger was not seized when officer asked the defendant to step out of the car and asked whether she possessed any drugs or weapons); *Graves*, 278 Or App at 129, 136 (the defendant was not stopped when officer asked her to step out of the car and walk toward his patrol car and asked questions about the defendant's parole status and criminal history).

The state is correct that, in each of those cases, we held that the defendant passengers were not seized when the officers asked the defendants to step out of the car, and thereafter requested consent to search or inquired about the defendants' criminal activity. However, we also explained that those actions did not convert the encounters into stops because the officers' requests "were not coupled with any other show of authority." *Dudley*, 245 Or App at 307. That is, those same requests could amount to a seizure if "coupled with other coercive actions." *Parker*, 266 Or App at 237. As we explained in detail above, that additional show of authority was present here. The troopers both engaged in conduct that increased the overall coerciveness of the encounter and provided significant context for Kendoll's request for consent to patdown defendant.

In any case, the question before us is fact-specific. *Backstrand*, 354 Or at 399. Although a comparison of the circumstances in the present case with those in prior cases is helpful, our focus remains on the unique circumstances of this case. And, as we observed in *Charles*, "the inquiry is not whether each of the officer's actions here, examined separately, would convey to a reasonable person that the person was not 'free to terminate the encounter or otherwise go about his or her ordinary affairs.'" 263 Or App at 584-85 (quoting *Backstrand*, 354 Or at 401-02). Rather, the question is "whether all of the officer's actions combine to form a whole greater than the sum of its parts; that is, whether,

based on the totality of the circumstances, a reasonable person would believe that the officer had intentionally and significantly deprived defendant of his freedom of movement." *Id*. at 585.

In *Charles*, the defendant was seized when the officer approached the defendant's home, spoke with the defendant's wife about criminal conduct, asked the defendant to speak outside, and then led him to an area outside where the officer conducted field sobriety tests, read *Miranda* warnings, and asked for consent to conduct a patdown. *Id*. at 587-88. We explained that, "were we to look at each piece of the encounter between defendant and the officer independently, we would not necessarily conclude that any one piece, standing alone, amounted to a stop." *Id*. at 584. However, we concluded that all of those circumstances combined "would have conveyed to a reasonable person that he or she was not free to end the encounter and depart." *Id*. at 587.

We followed that approach again in *Newton*. There, the officer responded to a late-night report of a woman and a man arguing in a van. The defendant and his girlfriend, R, were sitting in the van, which was parked in R's driveway, when the officer approached to check on R's welfare. The officer asked R if she was all right, and then asked her to step out of the van so that he could speak to her. The conversation that followed took place behind the van, and, after learning that the defendant's license was suspended, the officer asked R questions about whether the defendant had been driving. *Newton*, 286 Or App at 276-77. We held that the defendant was seized based on the combination of several circumstances: (1) the encounter took place on a private driveway; (2) the intrusion occurred late at night; (3) the officer "conveyed suspicion that defendant had done something to harm R"; and (4) the officer "physically positioned himself behind the van" while he questioned R, which "hindered defendant's ability to leave the encounter and was a 'show of authority' that the van would be staying put until [the officer] completed his investigation." *Id*. at 281-82, 284-85.

Here, as in *Charles* and *Newton*, the troopers' actions "combine[d] to form a whole greater than the sum of its parts," and we, therefore, conclude that defendant was

seized at the time that Kendoll requested defendant's consent to perform the patdown. *Charles*, 263 Or App at 585.

Because we conclude that defendant was seized under Article I, section 9, we must analyze the lawfulness of the seizure. The state does not argue that the troopers had reasonable suspicion of criminal activity, it argues only that the seizure was justified by officer-safety concerns. Therefore, the only question before us with respect to the lawfulness of the stop is whether it was justified under the officer-safety doctrine.

Article I, section 9, does not prohibit an officer from taking "reasonable steps to protect [the officer] or others if, during the course of a lawful encounter with a citizen, the officer develops a reasonable suspicion, based on specific and articulable facts, that the citizen might pose an immediate threat of serious physical injury to the officer or to others then present." *State v. Bates*, 304 Or 519, 524, 747 P2d 991 (1987). The state bears the burden of establishing that the officer subjectively believed that the defendant posed a threat and that the officer's belief was objectively reasonable. *State v. Smith*, 277 Or App 298, 303, 373 P3d 1089, *rev den*, 360 Or 401 (2016). "An officer's subjective belief that a defendant posed a threat is not objectively reasonable if it is based 'on intuition or a generalized fear that the person may pose a threat to the officer's safety'; rather, it 'must be based on facts specific to the particular person.'" *State v. Najar*, 287 Or App 98, 107-08, 401 P3d 1205 (2017) (quoting *Smith*, 277 Or App at 303).

We conclude that the stop was not justified under the officer-safety doctrine, because the state failed to prove that the troopers had objectively reasonable beliefs that defendant posed a threat. The state argues that the troopers' conduct—namely, Nelson's order that defendant exit the car and Kendoll's request for a patdown—was justified because Nelson had legitimate concerns for the troopers' safety after he learned that defendant was an "armed career criminal." Assuming Nelson's testimony was sufficient to establish his subjective belief that defendant posed a threat to the troopers, that belief was not objectively reasonable under the circumstances given the lack of "specific and articulable facts * * *

508 State v. Prouty

that would reasonably create a fear for the safety of the officer or others." *State v. Madden*, 363 Or 703, 713-14, 427 P3d 157 (2018). Nelson testified that defendant was "docile" and "on the nod" during the encounter. Nothing in the record suggests that defendant behaved or spoke in a way that was threatening to the troopers. Although Nelson may have believed that defendant could be armed based on his reported status as an "armed career criminal," that vague and very broad description unsupported by any further information is not a specific and articulable fact sufficient to reasonably create a fear for officer safety here. That generic report, without more, did not render Nelson's officer-safety concerns objectively reasonable. *See State v. Dyer*, 157 Or App 326, 332, 970 P2d 249 (1998) (officer-safety concern was not objectively reasonable where the defendant was cooperative and had not "said or done anything that could be interpreted as creating an immediate threat of serious physical harm" even though the defendant carried a knife and had a prior conviction for weapons possession); *State v. Bailey*, 307 Or App 782, 794, 479 P3d 304 (2020) ("[T]he mere fact that a person possesses a weapon does not, *per se*, render officer-safety concerns objectively reasonable."). The state also points to Nelson's testimony that it would be unsafe to search the car with defendant inside of it. That concern, although legitimate, is the sort of safety concern that is too generalized to form the basis of an objectively reasonable belief that defendant posed a threat.[2]

As for Kendoll, there are no specific or articulable facts sufficient to establish his subjective belief that defendant posed a threat, let alone an objectively reasonable one. There is no evidence that Nelson communicated defendant's status to Kendoll or that Kendoll was otherwise aware of that fact. Moreover, Kendoll did not testify that he had a subjective belief that defendant posed a threat

---

[2] We do not suggest that an officer is prohibited from asking a person to step out of a vehicle that the officer intends to search, absent a specific concern about that person. As we acknowledged earlier, an officer may make requests of that nature in effectuating a lawful search without converting the encounter into a seizure. However, the issue is not whether Nelson's generalized concern justified his request that defendant step out of the car, but whether it justified the seizure as a whole, which seizure included more than just Nelson's request that defendant leave the car.

for any reason. To the contrary, Kendoll explained that he was "relaxed" because he "didn't have any sense * * * that [defendant] was a threat to [the troopers]." Nor is any subjective fear evident in the troopers' brief conversation prior to the patdown, when Kendoll offered to search defendant in response to Nelson's comment that he wanted "to make sure that [defendant] didn't stuff anything on his person because [the driver was] high on meth." Because the state failed to prove that the troopers held objectively reasonable beliefs that defendant posed a threat, the officer-safety doctrine does not apply here.

In sum, we conclude that defendant was unlawfully seized when Kendoll requested consent to perform the patdown. Therefore, the trial court erred in denying defendant's motion to suppress.[3] We also conclude that that error was not harmless.

Reversed and remanded.

---

[3] The state makes no argument that the discovery of the evidence was attenuated from the unlawful seizure, and therefore, the evidence discovered after defendant was unlawfully seized must be suppressed. *State v. Miller*, 267 Or App 382, 398, 340 P3d 740 (2014) ("Whenever the state has obtained evidence following the violation of a defendant's Article I, section 9, rights, it is presumed that the evidence was tainted by the violation and must be suppressed."); *see also State v. Davis*, 282 Or App 660, 674 n 6, 385 P3d 1253 (2016) ("The state makes no argument on appeal that, in the event we conclude that the search of defendant was unlawful, the challenged evidence was nevertheless admissible. Absent a developed argument by the state, we conclude that the evidence must be suppressed.").