KISTLER, J.
*1061 **93 In State v. Amaya , 336 Or. 616, 89 P.3d 1163 (2004), this court stated that stopping the driver of a car does not constitute a seizure of the passengers for the purposes of Article I, section 9, of the Oregon Constitution. We allowed review in this case to decide whether that statement constituted part of the court's holding and, if it did, whether we should overrule that part of Amaya . For the reasons set out below, we conclude that our statement was part of the holding in Amaya , and we adhere to it.
The remaining question in this case is whether defendant (a passenger in a van) was stopped without reasonable suspicion at some point during a stop of the driver. The trial court ruled that defendant was not stopped until an officer asked her for consent to search her backpack, and it accordingly denied her motion to suppress evidence discovered during the search. The Court of Appeals upheld the trial court's ruling but on a different ground; it determined that the stop did not occur until after defendant had consented to a search of her backpack. State v. Stevens , 286 Or. App. 306, 399 P.3d 1053 (2017). Because we hold that the stop occurred before defendant gave consent and that the officer lacked reasonable suspicion at that point, we reverse the Court of Appeals decision and the trial court's judgment.
We take the facts from the hearing on defendant's suppression motion and state them consistently with the trial court's ruling. While on patrol, Officer Klopfenstein stopped a van because one of its headlights was out. There were three passengers in the minivan. After asking the driver for his identification, the officer asked the driver about the passengers, and the driver explained that he had just met them. Klopfenstein returned to his patrol car to ask dispatch to run a records check on the driver.
While Klopfenstein waited for dispatch to get back to him, he approached the van a second time. On coming back to the van, Klopfenstein noticed that one of the passengers in the back seat was acting as if he were extremely intoxicated. Klopfenstein asked that passenger for identification. The passenger responded that he did not have any **94 identification on him but said that his name was Jonathan Shaw. When Klopfenstein asked Shaw to spell his name, Shaw gave multiple, inconsistent spellings of Jonathan. Klopfenstein asked the driver if he could open the sliding door to the back of the van so he could hear Shaw better. The driver agreed, and Klopfenstein opened the door.
When that proved unsuccessful, Klopfenstein directed his attention toward defendant, who was sitting in the back seat next to Shaw. Klopfenstein asked defendant for her name. Defendant told him her name and added that she was on parole. When Klopfenstein asked defendant if she knew Shaw, she said that she had known him for a couple of years and that she had always known him as Jonathan Shaw. With that information, Klopfenstein returned to his patrol car to run a records check on both Shaw and defendant.
That records check confirmed that defendant was on parole, but the photograph on file for Jonathan Shaw did not resemble the person in the van. By this time, a second officer had arrived, and Klopfenstein again returned to the van. He asked Shaw to step out of the van. According to Klopfenstein, he confronted Shaw with the fact that he did not resemble the picture of Jonathan Shaw on file with the Department of Transportation. As Klopfenstein testified, he kept "going back to [defendant] and going back to [Shaw] and going back" to defendant to find out Shaw's real name. Klopfenstein explained that his interactions with defendant were very friendly "other than initially me coming back to her saying (-Inaudible-) you're on parole. If [Shaw] has a warrant and you're telling me he's Jonathan and he's Jimmy there's going to be trouble for you * * * potentially through your P[arole] O[fficer]." After Klopfenstein implied that he would be *1062 speaking with defendant's parole officer, defendant told him Shaw's real name-Jimmy.
At that point, a records check on Jimmy Shaw came back showing that there were no outstanding warrants. While he was away from the van and without defendant's knowledge, Klopfenstein called defendant's parole officer. During that call, the parole officer told Klopfenstein that she recently had found a backpack with pills in it and that **95 she thought that the pills belonged to Shaw. The parole officer explained that defendant had been with Shaw when the pills were found in the backpack and that, if defendant was with Shaw again, "it was [the parole officer's] opinion that [defendant] was * * * likely using drugs again."
After speaking with the parole officer, Klopfenstein returned and noticed that defendant had gotten out of the van. He also noticed that defendant had a backpack over her shoulder and that it "appeared she was going to be walking off."[1] Klopfenstein did not tell defendant to stop, but he did ask her if he "could search her backpack." She consented.
Although the record is not completely clear, at some point during that process, the second officer had begun searching Shaw's bag. What is clear from the record is that, when Klopfenstein asked defendant if he could search her backpack, the second officer "was over on the other side of his car with Mr. Shaw wrapping up." As Klopfenstein explained,
"Mr. Shaw was putting his stuff [back] because we had searched Mr. Shaw's bag and found some brass knuckles and other stuff, and [the other officer] was in the process of just kind of watching Mr. Shaw while he bundled his stuff up getting ready to leave."
When Klopfenstein searched defendant's backpack pursuant to her consent, he found a pipe with residue in it, which turned out to be methamphetamine. At that point, Klopfenstein read defendant her Miranda rights, asked her more questions, and placed her under arrest.
The state charged defendant with possessing methamphetamine. Before trial, defendant moved to suppress **96 the evidence discovered as a result of the consent search, arguing, among other things, that Klopfenstein unlawfully had stopped her before she consented. The trial court denied her motion and found that Klopfenstein "did not ask [defendant] to get out of the van," that defendant voluntarily consented to the search of her bag, and that "the stop actually initiated when [Klopfenstein] asked [defendant] if [s]he [w]ould consent." After a stipulated facts trial, the court found defendant guilty of unlawful possession of methamphetamine and entered judgment accordingly.
Defendant appealed from the judgment, assigning error to the trial court's ruling denying her motion to suppress. On appeal, defendant renewed her argument that Klopfenstein had unlawfully stopped her before she consented to the search and that the search was a product of that illegality. See Stevens , 286 Or. App. at 307, 399 P.3d 1053. The Court of Appeals concluded that the stop and the resulting consent were lawful. Consistently with this court's decision in Amaya , the Court of Appeals reasoned that "a passenger in a lawfully stopped vehicle is not automatically seized by virtue of her status as a passenger." Id. at 312, 399 P.3d 1053. The court then held that defendant was not stopped until after she had given voluntary consent to search. The court explained that, before then, "all that [Klopfenstein] had done was ask defendant questions, request information, and seek her cooperation with *1063 respect to [the] investigation of Shaw's identity." Id. at 314, 399 P.3d 1053. Because defendant's consent preceded the stop, the Court of Appeals upheld the trial court's ruling denying defendant's motion to suppress. Id.
On review, defendant raises primarily two issues. Relying on Brendlin v. California , 551 U.S. 249, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007), she argues initially that we should hold under Article I, section 9, that the passengers in a car are stopped when the car is stopped. Defendant acknowledges that for us to accept her proposed rule, we would have to either distinguish or overrule Amaya and State v. Thompkin , 341 Or. 368, 143 P.3d 530 (2006). Defendant recognizes that both cases clearly stated that stopping a car does not constitute a seizure of the passengers for state constitutional purposes, but she argues that the court's statements **97 in those cases were either dicta or inadequately considered.[2] Alternatively, defendant argues that, even if she were not stopped when the car was stopped, Klopfenstein unlawfully stopped her later when he told her that she could be in trouble with her probation officer if it turned out that Shaw's name was not Jonathan and there was a warrant out for his arrest. Defendant reasons that her consent was the product of that unlawful seizure.
We begin with defendant's argument that our decisions in Amaya and Thompkin should either be distinguished or overruled. Defendant argues initially that our ruling in those cases-that for state constitutional purposes stopping a driver does not constitute a seizure of the passengers-was dicta . It follows, she concludes, that we need not overrule Amaya and Thompkin . It is sufficient to distinguish them. In considering defendant's argument, we begin with our decision in Amaya .
The defendant in Amaya was a passenger in a van that was stopped for failing to signal and driving with a broken license plate light. 336 Or. at 618, 89 P.3d 1163. The defendant argued that an officer had seized her, at the latest, when he asked her about the contents of her bag after she had stepped out of the van at the officer's request. Id. at 629-30, 89 P.3d 1163.[3] In seeking to determine the point at which the stop occurred, this court began by recognizing that, in stopping the van, the officer had not seized the defendant for the purposes of Article I, section 9 ; that is, the stop of the driver of the van was not itself a coercive circumstance as to the defendant, neither was the officer's request for the defendant to step out of the van at least when the driver had consented to a search of the van. Id. at 630-31, 89 P.3d 1163. However, this court observed that a further exercise of coercive authority after the defendant **98 had stepped out of the van could constitute a seizure. Id. at 631, 89 P.3d 1163.
Ultimately, this court concluded that it was "unnecessary * * * to decide if [the] defendant was 'seized' by [the officer]'s question[s]" to the defendant because, by the time he posed the questions, any stop was justified because he reasonably suspected that she posed an immediate threat of serious injury to him. Id. As we read the court's decision in Amaya , it was necessary to consider the coercive force of the circumstances that preceded the officer's questions about the defendant's bag to determine whether a stop occurred before the officer posed those questions. It may be, as defendant argues, that this court could have analyzed the stop issue in Amaya differently than it did. It does not follow, however, that this court's conclusion-that the stop of the driver was not a seizure of the passengers for the purposes of the Oregon Constitution-was dicta . The fact that the court might have reached the same conclusion by a different route does not mean that the route it chose to take does not have precedential force. See *1064 Engweiler v. Persson/Dept. of Corrections , 354 Or. 549, 558-59, 316 P.3d 264 (2013) (explaining that foundational reasoning is not dicta even when the rationale could have been structured differently).
Any doubt about the precedential force of Amaya was resolved two years later in Thompkin . The defendant in Thompkin was a passenger in a lawfully stopped car, as the defendant in Amaya had been. Thompkin , 341 Or. at 371, 143 P.3d 530. In considering whether the defendant was seized at some point after the car had been stopped, the court began in Thompkin by quoting Amaya for the proposition that passengers in a lawfully stopped car are not automatically seized for the purposes of Article I, section 9. Id. at 377, 143 P.3d 530. The court also recognized that the officer in Thompkin had no independent reasonable suspicion for stopping the defendant. Id. at 376, 143 P.3d 530. The court concluded that the officer had seized the defendant midway through the stop without reasonable suspicion when the officer retained the defendant's identification, conducted a warrants check, and questioned her about illegal activity. Id. at 378-79, 143 P.3d 530.
**99 Defendant argues that there was no need for this court to decide whether the defendant in Thompkin was seized when the car was stopped initially because the court determined that she was seized later during the stop. We reach a different conclusion. It was only because the court held initially that the defendant had not been seized when the officer first stopped the driver that the later seizure of the defendant without reasonable suspicion became a constitutional problem. Put differently, if the defendant in Thompkin had been lawfully stopped as a result of the earlier constitutional stop of the driver, then it is difficult to see how the officer's later actions during a lawful stop would have constituted a separate seizure that required additional justification, at least under the precedents that defendant urges us to adopt. Contrary to defendant's argument, the proposition from Amaya -that the stop of the driver is not a seizure of the passengers for state constitutional purposes-was a necessary predicate to the court's holding in Thompkin that the officers seized the defendant without reasonable suspicion in violation of Article I, section 9, midway through the lawful stop of the driver.
Having concluded that the rule announced in Amaya and applied in Thompkin was essential to those decisions, we turn to defendant's argument that we should reconsider that rule. As we understand defendant's argument, she faults this court's decision in Amaya on the ground that the court did not offer any "analysis or explanation" for its rule. Additionally, relying on Brendlin , she argues that passengers in a stopped car would not feel free to walk away and that there are sound policy reasons for treating a stop of a car as a stop of the passengers. As we understand the rule in Brendlin , it rests on the proposition that, even when an officer lacks a reasonable suspicion that the passengers in a stopped car have committed a traffic or criminal offense, a categorical rule that passengers may be seized when the driver is stopped is justified for officer safety reasons. Brendlin , 551 U.S. at 258, 127 S.Ct. 2400 (citing Maryland v. Wilson , 519 U.S. 408, 414-15, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997) ); see Arizona v. Johnson , 555 U.S. 323, 331-32, 129 S.Ct. 781, 172 L.Ed.2d 694 (2009) (discussing Brendlin ).
**100 Oregon has taken a different course. Unlike the federal courts, the Oregon courts have not recognized a categorical right to direct the passengers to step out of a stopped car or comply with the officer's demands. See State v. Ayles , 348 Or. 622, 628, 237 P.3d 805 (2010) (accepting the state's concession that retaining the passenger's identification during an otherwise valid traffic stop constituted an unjustified seizure of the passenger). Indeed, this court declined to adopt the state's proposed per se rule that officers always may ask a stopped defendant whether he or she has a weapon. State v. Jimenez , 357 Or. 417, 426, 353 P.3d 1227 (2015). It held instead that an officer may extend a stop by asking the defendant about a weapon only when the question is "reasonably related" to the stop-i.e. , when there is a "reasonable, circumstance-specific" relationship between the stop and the question. Id. at 429, 353 P.3d 1227 ; see also *1065 State v. Miller , 363 Or. 374, 422 P.3d 240, adhered to as modified , 363 Or. 742, 428 P.3d 899 (2018) (applying Jimenez to a suspect stopped for driving under the influence).
This court's decisions in Amaya and Thompkin fit comfortably within that state constitutional framework. They recognize that a reasonable suspicion that a driver has committed a traffic or other offense does not justify a categorical limitation on the passenger's freedom and that an officer may not seize a passenger without a constitutional justification for doing so. Moreover, implicit in Amaya and Ayles is the proposition that the passengers in a car stopped for a traffic or criminal offense would not understand that the officer's show of authority in stopping the driver extended to them. For us to overrule Amaya , as defendant requests, would create an anomaly in an otherwise consistent pattern of Article I, section 9, decisions. We decline to do so and adhere to our decision in Amaya .
Because Klopfenstein's stop of the driver did not seize defendant, the question becomes whether he seized defendant later during the stop. That is, did Klopfenstein convey to defendant "either by word, action, or both, that [she was] not free to terminate the encounter or otherwise go about [h]er ordinary affairs." State v. Backstrand , 354 Or. 392, 401, 313 P.3d 1084 (2013) ; see id. ("What is required is a reasonable perception that an officer is exercising his or her **101 official authority to restrain."). On that issue, we have recognized that "verbal inquiries by officers are not seizures." Id. at 403, 313 P.3d 1084 (internal quotation marks omitted). "[S]omething more than just asking a question, requesting information, or seeking an individual's cooperation is required of an officer's conduct." Id. However,
"when the content of the questions, the manner of asking them, or other actions that the police take (along with the circumstances in which they take them) would convey to a reasonable person that the police are exercising their authority to coercively detain the citizen, then the encounter rises to the level of a seizure, the lawfulness of which must be analyzed as such."
Id. at 412, 313 P.3d 1084.
With that standard in mind, we turn to the facts of this case. Under Backstrand , the mere fact that Klopfenstein asked defendant to confirm Shaw's name did not constitute a seizure. As Backstrand explained, officers are free to ask citizens for information without mere conversation becoming a seizure. However, after that initial inquiry, Klopfenstein's questions and actions became increasingly coercive. Specifically, Shaw had been behaving oddly, and Klopfenstein asked Shaw for his identification.[4] Even though Shaw's response (he could not spell Jonathan) raised questions, defendant told Klopfenstein that she had known Shaw for two years and confirmed that his name really was Jonathan Shaw. She thus became enmeshed in Klopfenstein's extended inquiry of Shaw.
Specifically, when Klopfenstein learned after running a records check that Jonathan Shaw's picture did not resemble the passenger in the minivan, he confronted Shaw with that discrepancy. Defendant had been sitting beside Shaw and had vouched that his name was Jonathan, and Klopfenstein went "back and forth" between Shaw and defendant asking each one what Shaw's real name was. Finally, he turned to defendant and told her that if she were lying about Shaw's real name and if it turned out that there was **102 an outstanding warrant for Shaw's arrest, defendant could potentially be in trouble with her parole officer.
At that point, if not before, Klopfenstein's interaction with defendant constituted a seizure. See State v. K.A.M. , 361 Or. 805, 813, 401 P.3d 774 (2017) ; see also State v. Jackson , 268 Or. App. 139, 146, 342 P.3d 119 (2014) (collecting cases holding that asserting that a person has committed a crime can constitute a stop). A reasonable person in defendant's position would not have felt free to terminate the inquiry and go about her business. Indeed, by warning defendant that, if it turned out she were lying, she could be *1066 in trouble with her parole officer, Klopfenstein implicitly communicated to defendant that she was not free to leave until he determined who Shaw really was and whether a warrant had been issued for Shaw's arrest.
By the time that Klopfenstein made that statement, Shaw and defendant had become inextricably interconnected. She had vouched for him when she confirmed that his name was Jonathan, and Klopfenstein had insistently focused on both of them in trying to figure out Shaw's real name, confronting Shaw with the discrepancy between his appearance and the picture of Jonathan Shaw, going "back and forth" between Shaw and defendant in an effort to learn Shaw's name, and leveraging the possibility of trouble with defendant's parole officer to cause her to admit Shaw's real name. In short, defendant reasonably perceived from Klopfenstein's show of authority that she was not free to leave until Shaw's true identity and warrant status were determined.
The state does not argue that Klopfenstein reasonably suspected that defendant had committed a crime when he told her that she could be in trouble with her parole officer if she were lying about Shaw's name.[5] The state, **103 however, argues that any seizure that occurred as a result of that statement ended before Klopfenstein asked defendant for consent to search her backpack. The state notes that Klopfenstein testified that, when he finished his call with defendant's parole officer, he saw that defendant had gotten out of the van, and it "appeared she was going to be walking off."[6] The state reasons that, because it appeared as if defendant was "just going to be walking off," either Klopfenstein's earlier statements had not, in fact, restrained her or the seizure had ended and she understood that she was free to leave.
One difficulty with the state's argument is that, when Klopfenstein saw defendant apparently walking off, he asked her for consent to search her backpack. To be sure, he did not explicitly tell her to stop. However, his question communicated that she was not free to go. He still wanted to see what she had in the backpack. Whatever might be inferred from defendant's incipient effort to walk off, Klopfenstein did not let her go. Moreover, the other officer was concluding a search of Shaw's belongings when Klopfenstein asked defendant for consent to search her backpack. We are not persuaded that a reasonable person in these circumstances would have understood that the encounter had reverted to mere conversation.
Beyond arguing that any seizure had ended before Klopfenstein asked for consent to search defendant's backpack, the state reasonably does not argue that defendant's consent was not the product of the earlier unlawful seizure. See State v. Unger , 356 Or. 59, 75, 333 P.3d 1009 (2014) (explaining that, when consent to search follows an unlawful stop, the state must "demonstrat[e] that (1) the consent was voluntary; and (2) the voluntary consent was not the product of police exploitation of the illegal stop or search"). Not only was there no break in time between the seizure and the request for consent, but the contemporaneous search of **104 Shaw's belongings reinforced the notion that Klopfenstein's request to search her backpack related to and grew out of his efforts to learn Shaw's name. See State v. Jarnagin , 351 Or. 703, 277 P.3d 535 (2012) (noting factors that bear on attenuation). Because Klopfenstein unlawfully stopped defendant before asking for her consent to search her backpack and because we are not persuaded that defendant's *1067 consent was attenuated from the unlawful seizure, we conclude that the trial court should have granted defendant's motion to suppress.
The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

Defendant testified to a different version of events. She testified that Klopfenstein was waiting for a call from the parole officer, that she "was tired of waiting [for the parole officer to call] and I asked him, I said, well, can I just walk. He says yeah." The trial court, however, did not credit defendant's testimony. Rather, it explicitly found, as Klopfenstein had testified, that he was not in fact waiting for a call from the parole officer and that, when Klopfenstein finished the call with the parole officer, he "saw the Defendant getting out of the van and asked her if he could search and she consented." Because the trial court credited Klopfenstein's version of the events, it necessarily did not credit defendant's statement that, while Klopfenstein was waiting for a call from her parole officer, she asked him whether she could "just walk," and he said "yeah."

In defendant's view, the continuing validity of Amaya matters because Klopfenstein unnecessarily prolonged the stop of the driver. Defendant argues that, if the stop of the driver was thus unlawful and she was stopped derivatively, then her stop was also unlawful.

The defendant identified a series of actions that the officer took before he asked her about the contents of her bag that, in the defendant's view, constituted a seizure. Amaya , 336 Or. at 628-30, 89 P.3d 1163. The court rejected some of those arguments as either unpreserved or because they depended on factual premises that were inconsistent with the trial court's findings. Id.

We express no opinion on whether Klopfenstein's question to Shaw was reasonably related to the stop of the driver.

At that point, Klopfenstein had not spoken to defendant's parole officer. Moreover, even after he had done so, he testified that he did not believe he had a basis for stopping her. Specifically, Klopfenstein agreed on cross-examination that, when he asked defendant for consent to search her backpack, he "didn't have information that [defendant had] violated the law and [the parole officer] didn't actually ask [him] to detain [defendant]." Klopfenstein also agreed that, in asking for consent, it was "[n]ot so much that [he had] reasonable suspicion so much as it [wa]s that [he] just fe[lt] that there's some things that [he] should look into if [defendant] w[ould] let [him]."

The state also relies on defendant's testimony about the events that surrounded Klopfenstein's call to the probation officer. As noted above, however, the trial court rejected defendant's testimony and credited Klopfenstein's. As we read the trial court's findings and the record, the court could not have credited Klopfenstein's testimony without rejecting all of defendant's testimony on that issue.