Argued and submitted May 6, 2020, affirmed April 14, petition for review denied August 26, 2021 (368 Or 514)

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## MICHAEL ALLEN PAYNE,
*Defendant-Appellant.*

### Baker County Circuit Court
17CR84874; A167457

487 P3d 413

Defendant appeals from a judgment of conviction for six offenses stemming from his refusal to comply with an officer's order to remain at the scene of a stop, subsequent altercation with officers, and drugs that were recovered at the scene. He argues that the trial court erred in denying his motion to suppress evidence obtained during the encounter because he was unlawfully seized at the outset when the officer ordered him to show his hands. As a result, he argues, the officer's subsequent orders and arrest were unlawful, meaning that the trial court also erred in denying his motion for judgment of acquittal on the charges of interfering with a peace officer and third-degree escape. The state responds that the officer's initial order was lawful because it was prompted by a reasonable officer-safety concern. *Held*: The officer's initial order was lawful under the officer-safety doctrine. Defendant was seized when police stopped the car in which he was a passenger because the circumstances would have communicated to a reasonable person that the officer's show of authority extended to him. At that point, although defendant's own conduct did not give rise to a concern for officer safety, the officer's safety concerns were reasonable under the totality of the circumstances. Because the order for defendant to show his hands was a reasonable response to those concerns, defendant was lawfully seized.

Affirmed.

Gregory L. Baxter, Judge.

David Sherbo-Huggins, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Philip Thoennes, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Lagesen, Presiding Judge, and James, Judge, and Kamins, Judge.

KAMINS, J.

Affirmed.

**KAMINS, J.**

Defendant, a passenger in a vehicle that was stopped after eluding the police, appeals from a judgment of conviction after a jury trial for a number of crimes stemming from defendant's refusal to comply with an officer's order to remain at the scene of the stop, subsequent altercation with officers, and drugs that were recovered at the scene. Defendant contends that he was unlawfully seized at the outset of the encounter, meaning that the evidence obtained should have been suppressed and that he should have been acquitted of charges stemming from disobeying the order effectuating the unlawful seizure and the charges stemming from the subsequent physical altercation with the officers.[1] We conclude that defendant was lawfully seized when the vehicle in which he was a passenger was stopped and therefore affirm.

We review a trial court's denial of a motion to suppress for legal error, and we are bound by the trial court's findings of historical fact as long as there is constitutionally sufficient evidence in the record to support those findings. *State v. Ehly*, 317 Or 66, 74-75, 854 P2d 421 (1993). Similarly, we also review the denial of a motion for a judgment of acquittal for legal error, and we consider the facts in the light most favorable to the state and draw all reasonable inferences in the state's favor. *State v. Lupoli*, 348 Or 346, 366, 234 P3d 117 (2010). We begin with the operative facts, described with these standards in mind.

Baker City Police Officer Smith was on patrol at around 11:20 p.m. on December 23, 2017, when he noticed a car driving with an obscured license plate. Smith activated his overhead lights and attempted to stop the car, but, after slowing briefly, the car sped back up to between 30 and 35 miles per hour. Smith turned on his spotlight and sirens and pursued the car. Through the spotlight illuminating the

---

[1] Defendant also argues that the trial court committed plain error in instructing the jury that it could return a nonunanimous verdict, despite the fact that the jury's verdicts were unanimous. This argument has been foreclosed by *State v. Chorney-Phillips*, 367 Or 355, 359, 478 P3d 504 (2020) (holding that error in instructing the jury that it could return nonunanimous guilty verdicts did not require reversal of convictions rendered by unanimous guilty verdicts).

compartment, Smith could see defendant—the passenger in the car—making "very, very rapid movements," including a lot of movements around the floorboard, all around the side, and "leaning over towards the driver, yelling, talking, something like that, seemed very frantic." Smith drove up next to the vehicle as if performing a "pit maneuver" and motioned for the car to pull over. The car slowed down so Smith "backed off, thinking maybe they'd stop." Instead of stopping, however, the car again sped up. Smith attempted the same tactic, again pulling up and flanking the car, and again, the car slowed until Smith backed off, only to speed up again.

The pursuit lasted between one-third and three-fourths of a mile, at which point the car made a left turn off the main road into a large industrial site that Smith knew to be frequented by cars and campers occupied by people engaged in drug use. Smith followed as the car traveled between one-eighth and one-quarter of a mile down a long driveway, finally stopping in front of the shop and on the other side of a large log pile that hid the main road from view.

Smith testified that he was "very concerned" with the fact that the driver was "taking [him]" to this secluded site and he was "more concerned" with the passenger than the driver based on the passenger's frantic movements. He further testified that once a stop involves an attempt to elude the officer, it is no longer "routine." He had received training on the correlation between attempts to elude and officer shootings, and that the nature of an elude is inherently dangerous to an officer because the driver has already decided to disobey a police officer rather than stop and take a ticket. Consistent with this training, once the car stopped, Smith immediately got out of his car and held the car at gunpoint while he waited for the cover officer.[2]

At the same time that Smith drew his gun, defendant got out of the car. Smith ordered the driver and defendant

---

[2] Although Smith testified that he recognized the driver "right away" as someone whom Smith had recently learned had said that he "was going to make the police shoot him before going back to jail," it is not clear from the record whether he recognized the driver before or after he drew his gun.

to stay where they were and show him their hands. The driver remained in the car and placed his hand on the window, but defendant refused and attempted to leave. Smith told defendant that he was under arrest and that he was being detained because he was "part of this felony incident." Defendant was angry and yelling at the officer while reaching back into the car to remove two bags. He took the bags and began walking away from the vehicle, in the direction of Smith's patrol car.

During this encounter, Baker County Sheriff's Deputy Maldonado arrived on the scene. When Maldonado attempted to handcuff defendant, defendant dropped the bags he was carrying and "square[d] off" with Maldonado. They struggled, and an altercation ensued. Police subsequently deployed a drug detection dog on the bags that defendant had dropped, and, after the dog alerted, obtained a search warrant and found 50 grams of methamphetamine in one of defendant's bags. Defendant was charged with interfering with a peace officer, ORS 162.247; third-degree escape, ORS 162.145; resisting arrest, ORS 162.315; fourth-degree assault, ORS 163.160; unlawful delivery of methamphetamine, ORS 475.890; and unlawful possession of methamphetamine, ORS 475.894.

Defendant moved to suppress all of the evidence derived from Smith stopping him, including his conduct at the scene and the drug evidence. Defendant argued that Smith did not have reasonable suspicion that he had committed or was about to commit a crime, that Smith had therefore seized him unlawfully, and that all evidence derived from that unlawful seizure must be suppressed. The trial court denied defendant's motion, concluding that the seizure was justified by the officer-safety doctrine and that "the second [defendant] begins to disobey that order, he's interfering with a peace officer and at that point he's subject to not only stop, but arrest."

At the close of the state's case, defendant moved for a judgment of acquittal on all six charged counts. To support that motion, he argued that the charges for interfering with a peace officer and escape require that the officer's orders and arrest, respectively, be lawful, and neither were.

The state relied on the officer-safety doctrine to establish the lawfulness of the officer's orders. The trial court denied defendant's motion, concluding that "a rational trier of fact could find the essential elements of the crime beyond a reasonable doubt on all six matters."

On appeal, defendant assigns error to the denial of his motion to suppress and for judgment of acquittal. Defendant argues primarily that he was unlawfully seized when Smith first pointed his gun at the vehicle and ordered both defendant and the driver to remain with the vehicle and show their hands. As a result, defendant argues that he was entitled to a judgment of acquittal because the initial order Smith gave seizing him was not lawful so defendant did not commit interfering with a peace officer for disobeying it, or third-degree escape by attempting to leave the scene.

In response, the state argues that Smith's initial order seizing defendant was justified under the officer-safety doctrine and was therefore lawful. Assuming that the initial order was lawful, the state asserts that defendant's subsequent arrest was also lawful, that the evidence of defendant's conduct and the drugs found in his bag was properly admitted, and defendant was not entitled to a judgment of acquittal on the charge of either interfering with a peace officer or third-degree escape.

To resolve this issue, we must answer a threshold question: Was defendant lawfully seized? If the answer is yes, then the officer was authorized to order him not to leave and arrest him for refusing to comply. Defendant's decision to disobey that lawful order and leave the scene despite the officer's attempt to arrest him would constitute the crime of interfering with a peace officer and third-degree escape, justifying the denial of his motion for judgment of acquittal. If, however, the answer is no, then the denial of defendant's motion for judgment of acquittal may require reversal. *See State v. Kreis*, 365 Or 659, 664, 677, 451 P3d 954 (2019) (holding that an order that restrains an individual's liberty in violation of Article I, section 9, is not a "lawful order" for purposes of "the crime of interfering with a peace officer").

Before we can answer even our threshold question, however, we must first cross another threshold: *When* was defendant seized in the first place? For purposes of Article I, section 9, of the Oregon Constitution, a seizure occurs when (1) a police officer intentionally and significantly interferes with an individual's liberty or freedom of movement; or (2) a reasonable person, under the totality of the circumstances, would believe that his or her liberty or freedom of movement has been significantly restricted. *State v. Arreola-Botello*, 365 Or 695, 701, 451 P3d 939 (2019). The parties agree that defendant was seized at the point that the officer ordered him not to leave and to show his hands. However, at the point the officer issued that order, we conclude that defendant was already seized. That is so because, under these circumstances, defendant was seized when the officer stopped the car in which he was a passenger.[3]

Passengers in cars that are stopped for traffic violations are not themselves automatically stopped for purposes of Article I, section 9. *State v. Stevens*, 364 Or 91, 100, 430 P3d 1059 (2018). Unlike the federal constitution, the Oregon Constitution does not contain a "categorical" rule that such passengers are seized. *Id*. Despite the absence of a categorical rule, however, the *circumstances* of the stop may effectuate a seizure of both driver and passenger. A passenger is seized when police stop a car if there is "something more than the bare fact that the driver was pulled over for a traffic violation." *State v. T. T.*, 308 Or App 408, 418, 479 P3d 598 (2021).

The need for "something more" stems from the courts' rationale behind the absence of a categorical rule in Oregon's constitution. Our approach is premised on "the proposition that the passengers in a car stopped for a traffic or criminal offense would not understand that the officer's show of authority in stopping the driver extended to them." *Stevens*, 364 Or at 100. The theory goes that a passenger is typically unaffected by an officer's concern over the driver's

---

[3] The order to show defendant's hands came seconds after the car was stopped. Because the totality of the circumstances was the same at both points in time, our analysis of the legality of the seizure would not be different if the order had effectuated the seizure.

traffic infraction. If an officer stops a driver for failing to use a turn signal, the passengers in that vehicle would not think that the officer was concerned with them, let alone exercising a "show of authority" that "extended to them." *Id.*

To determine whether there is the "something more" sufficient to convey that the police are exercising their authority to detain the passenger, we look to the totality of the circumstances. *Id.*; *Arreola-Botello*, 365 Or at 701. In light of those circumstances, including the manner of the stop and the type of questions or physical acts by the officer, we evaluate whether a reasonable person would "understand that the officer's show of authority in stopping the driver extended to them or that the officer was independently restricting their movement apart from the stop of the driver." *T. T.*, 308 Or App at 418. If passengers, under the totality of the circumstances, would understand that the officer's show of authority in stopping the driver extended to them or that the officer was independently restricting their movement apart from the stop of the driver, the passenger is seized. *Id.*; *see also State v. Almahmood*, 308 Or App 795, 802-03, 482 P3d 88 (2021) ("In the end, the 'was it a seizure?' question often is framed in terms of whether a reasonable person in the defendant's position would have felt free to leave or to otherwise terminate the encounter with officers.").

Here, "something more" accompanied the officer's stop of the car in which he was a passenger such that defendant would understand that the officer's show of authority extended to him. Unlike a standard traffic stop, the driver of this car, upon observing the red and blue lights in the rearview mirror, did not, in fact, stop. The car initially slowed down as if to pull over, but then sped up instead. During the course of the pursuit, the officer shined a spotlight inside the passenger compartment, illuminating the compartment and observing the passenger. The officer turned on his siren and, as if he were performing a "pit maneuver" drove up alongside the car to motion the car to pull over—twice. Such conduct would likely "communicate to the occupants of the car that the show of authority was directed at both of them." *State v. Soto-Navarro*, 309 Or App 218, 227, 482 P3d 150

(2021) (observing as much about an officer's "flanking" of a car).

When the car finally did stop, the nature of the stop was also critically different from a routine traffic stop: it did not pull over to the side of the road. Rather, the car made a left turn off the road and drove approximately one-eighth to one-quarter of a mile down a long driveway into a secluded area blocked from view of the road. Given the concerns posed by the situation, the officer drew his gun on the vehicle. These shows of authority, which included pulling alongside the vehicle to force it to pull over or immediately drawing a gun upon the car to prevent occupants from leaving the vehicle, could not practically be limited to the driver. Instead, they extended to all occupants of the car, effectuating a seizure of the passengers and driver alike. And, under the totality of these circumstances, a reasonable person would not feel free to leave.

Now that we know when defendant was seized—when the car in which he was a passenger was stopped—we must next consider whether such a seizure was lawful. There is no debate that the officer could stop the *car*, so the parties' dispute centers on whether the officer could lawfully stop the *passenger*. The parties agree on appeal—correctly, in light of the concession on the matter during the suppression hearing—that the officer lacked reasonable suspicion at the time of the seizure that the passenger had committed a crime.

The state contends instead that officer-safety concerns justified the seizure of defendant because the police reasonably believed that the circumstances posed an immediate threat of serious injury and the action taken was proportionate to that threat. Defendant responds that the state's officer-safety concerns related to the driver's actions alone and that there was nothing specific and particular about the passenger that posed a risk to the officer, meaning that he was free to leave. However, that argument again presumes that this was a routine traffic stop, where an officer pulls over a car and the driver agrees to be pulled over. That presumption does not survive here because this was no

longer a traffic stop, or even a misdemeanor investigation: this was a felony investigation.

To determine whether officer-safety concerns justified a seizure, we look to the totality of the circumstances and evaluate (1) whether "specific and articulable facts" demonstrate the existence of a "reasonable suspicion on the part of the officer that a person with whom they are dealing poses an immediate threat to the officer's or another person's safety" and (2) "whether the precautions taken were reasonable under the circumstances." *State v. Madden*, 363 Or 703, 713, 427 P3d 157 (2018) (internal quotation marks omitted). The parties' dispute focuses on the contention that any officer-safety concerns were limited to the driver so any subsequent measures should have been so limited as well. However, that framework again stems from the premise that the passenger and driver are treated differently from the outset of the encounter, rather than as part of the totality of the circumstances.

The totality of the circumstances here indicate that the officer had an objectively reasonable basis to be concerned for his safety. It was late at night, and the car eluded multiple attempts by the officer to pull it over, requiring increasing shows of authority to force the vehicle to stop. Before stopping, the car drew the officer off the main road, into a dimly lit, secluded area hidden from view of the road and known to be a place where drug users congregate and stay overnight. The officer was outnumbered by the occupants of the vehicle. According to the officer's testimony, those actions amount to an elude and are inherently dangerous to the officer. Consistent with his training, he took action to secure the scene by holding the car at gunpoint and ordered its occupants to stay with the vehicle and show their hands while he waited for another officer to arrive. These officer-safety measures were appropriate to stop the car and the risk posed by the driver, and it is precisely those measures that amounted to the show of authority that converted the incident from a routine traffic stop to "something more."

In *State v. Miller*, the Supreme Court found an officer-safety concern to be objectively reasonable based

largely on the circumstances of a traffic stop. 363 Or 374, 385, 422 P3d 240, *adh'd to as modified on recons*, 363 Or 742, 428 P3d 899 (2018). There, the officer developed reasonable suspicion that the defendant driver was intoxicated. *Id*. Given the inherent risks involved with administering field sobriety tests to an intoxicated individual, and the fact that it was late at night, and despite the fact that defendant had been cooperative and had done "absolutely nothing" to present a threat to the officer, the court concluded that the officer's safety concerns were objectively reasonable. *Id*. at 378, 386-88. The "nature of the stop" was "particularly significant" to the analysis, as was the officer's training and experience regarding the danger of a DUII stop. *Id*. at 386-87. Similarly, the totality of the circumstances confronting the officer in this case present an objectively reasonable safety concern, regardless of the fact that defendant may not have been responsible for those circumstances.

According to defendant, however, the officer lacked a particularized suspicion that he—the passenger—posed an officer-safety concern and that it was therefore unlawful to order him to stay. He points to several cases in which we have held that generalized concerns over a defendant's conduct, including a defendant engaging in furtive movements or being in close proximity to criminal activity, do not amount to reasonable suspicion. *See, e.g.*, *State v. Kingsmith*, 256 Or App 762, 772, 302 P3d 471 (2013); *State v. Kentopp*, 251 Or App 527, 532-33, 284 P3d 564 (2012). However, those cases and the analysis employed relate to whether officers had reasonable suspicion that the defendant had committed a crime. The reasonableness of an officer's circumstance-specific safety concern does not turn on whether the officer had individualized suspicion of each person involved but is rather based on the totality of the circumstances. *Miller*, 363 Or at 383 ("For a circumstance-specific perception of danger justifying a weapons inquiry, the officer's safety concerns need not arise from facts particular to the detained individual; they can arise from the totality of the circumstances that the officer faces." (Internal quotation marks omitted.)). Cases evaluating whether an officer had reasonable suspicion that a defendant committed a crime are

of little relevance when evaluating a circumstance-based officer-safety concern.

Moreover, accepting defendant's approach—that, to detain a passenger, an officer's safety concerns must arise specifically out of that passenger's conduct—runs afoul of the rationale rejecting blanket rules in these contexts. *See State v. Jimenez*, 357 Or 417, 428, 353 P3d 1227 (2015) ("Although Article I, section 9, does not permit a blanket assumption that all encounters between police officers and detained individuals pose dangers that permit routine weapons inquiries, it also does not *per se* preclude all such inquiries."). Indeed, it is this same rationale that protects passengers of a traffic stop from an automatic seizure in the first place: the inquiry is based on the totality of the specific circumstances of the stop. *See Stevens*, 364 Or at 100. Being a "passenger" is not a talisman protecting an ability to walk away from an otherwise dangerous situation.

We have recognized other circumstances where police may have a reasonable circumstance-based fear for their safety even if there is no articulable fact specific to the defendant himself. For example, when officers enter a residence to execute a warrant and other occupants are present—essentially "passengers" in the house—officer-safety concerns permit them to detain the occupants long enough to ensure both the officers' and the occupants' safety. *State v. Swibies*, 183 Or App 460, 467, 53 P3d 447 (2002); *State v. Barnett*, 132 Or App 520, 524, 888 P2d 1064 (1995); *see also State v. Fair*, 353 Or 588, 609, 302 P3d 417 (2013) (allowing, in certain circumstances, the stop and temporary detention of a potential material witness to a crime).

In *Madden*, the Supreme Court applied this rationale to the question of whether police could seize a person who was sitting in a parked car outside a "drug house" where police had arrived to execute a warrant. 363 Or at 716. Despite having no particularized information about the defendant, the officers knew that the other person in the car was a known drug user, and the car's proximity to the house gave police a reasonable belief that it had "some connection" to the house. *Id.* Those facts, coupled with the officers' need to quickly secure the scene before entering the drug house

where the number of occupants or weapons was unknown, amounted to a legitimate officer-safety concern justifying the temporary detention of the defendant until the risk was mitigated. *Id*.

Having concluded that the officer here had an objectively reasonable safety concern under the totality of the circumstances, we turn to whether the protective measures taken were reasonable. *Id*. at 719. Two "principles" govern that inquiry: "that officer safety measures must be proportionate and that police officers must have latitude in deciding how to protect themselves." *Id*. at 719-20. The risk to the officer stemmed from the nature of the felony stop, the time of night, the fact that the car had lured the officer into a secluded, hidden area, and that he was outnumbered. His response—to order the occupants of the car to stay there and to point his gun at the vehicle to ensure they do so—was reasonable to address those risks until the scene was secured. This was not a case where an officer directed a passenger out of the car for a search, frisk, or investigative questions. *Cf. State v. Rudder*, 347 Or 14, 25, 217 P3d 1064 (2009) (recognizing that a "reasonable suspicion that a suspect might have a weapon *** can justify a patdown" and "that something more—such as, for example, a reasonable belief that the suspect is reaching for that weapon—is required to justify a more intrusive search").

In *Madden*, the security risk of defendant's presence near the drug house arose from the officers' "need to move quickly for safety reasons, to maintain the element of surprise, and *** their concern that defendant might attack them with a weapon from behind." 363 Or at 722. That threat justified the detention of the defendant "during the narrow window of time when the police officers were approaching and securing the house," but did not allow for his detention after the house was secured nor did it authorize any questioning. *Id*. at 723. Here, the officer-safety concerns justified the decision to detain defendant for the narrow period of time that those concerns were present. We do not have occasion to pass on whether the officer was faithful to that limitation because defendant committed crimes at the point of the seizure.

Because the initial seizure of defendant was lawful, his motion to suppress was properly denied. Moreover, defendant's refusal to comply with the initial order and subsequent arrest effectuating the seizure constituted the crimes of interfering with a peace officer and escape. The trial court correctly denied his motion for judgment of acquittal.

Affirmed.