216 February 19, 2026 No. 110

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JESUS ACOSTA PARRA,
aka Jesus Acosta, aka Jesus Acosta-Parra,
aka Jesus Acostaparra, aka Jesus Parra,
aka Jesus Acosta Parra,
*Defendant-Appellant.*

Douglas County Circuit Court
24CR26312; A185434

Steve H. Hoddle, Judge.

Submitted January 6, 2026.

Frances J. Gray filed the briefs for appellant.

Dan Rayfield, Attorney General, Benjamin Gutman, Solicitor General, and Timothy A. Sylwester, Assistant Attorney General, filed the brief for respondent.

Before Tookey, Presiding Judge, Kamins, Judge, and Jacquot, Judge.

KAMINS, J.

Reversed and remanded.

**KAMINS, J.**

Defendant appeals from a judgment convicting him of one count of unlawful delivery of a schedule II controlled substance, ORS 475.752(1)(b).[1] He assigns error to the trial court's denial of his motion to suppress evidence, arguing that he was unlawfully stopped as a vehicle passenger without reasonable suspicion of a crime. For the reasons that follow, we agree that defendant was unlawfully stopped, and therefore reverse and remand.

We review a trial court's denial of a motion to suppress for legal error, accepting the trial court's findings of fact that are supported by constitutionally sufficient evidence in the record. *State v. Vannoy*, 326 Or App 11, 13, 530 P3d 503 (2023). To the extent that the court failed to make express findings on pertinent historical facts, we presume that the court found those facts in a manner consistent with its ultimate conclusion. *Id.* We recite the facts, as taken from the record made at the hearing on defendant's motion to suppress, in accordance with that legal standard.

At approximately 8:40 a.m., defendant and his uncle, P, were driving northbound on Interstate 5 in Douglas County. P was driving and defendant was sitting in the front passenger seat. Oregon State Police Trooper Randall observed them following too closely behind a truck and pulled them over on the side of the highway.[2]

Randall walked up to the passenger side of the vehicle and told P in English that he was warning him for following the truck too closely. Randall also asked P for his license, registration, and insurance. P responded in Spanish that he did not have a license or insurance, but provided Randall with a Mexican voter ID card with a picture that did not appear to be him, and registration. Randall noted that the car was recently registered 11 days before in the San Francisco Bay Area, and he thought it was "very odd" that the driver was coming from another state without a

_____

[1] The jury also found defendant guilty of unlawful possession of a schedule II controlled substance, ORS 475.752(3)(b), and that guilty verdict was merged with the verdict on the unlawful delivery count.

[2] On appeal, defendant does not appear to dispute that Randall had probable cause to stop the driver for a traffic violation.

license and without insurance. Randall also noticed that the car appeared "lived in" due to food and drink containers, but that the back seat was empty. Randall walked back to his car and returned, this time with a Spanish interpreter on his cell phone. Randall informed P that he was following too closely and asked if P would go back to his police car with him so that he could ask him more questions. By then, approximately eight minutes had elapsed from the initial traffic stop. P agreed and exited the vehicle. At that point, defendant also attempted to exit the vehicle, but Randall indicated that defendant should stay in the car.

For the next 20 minutes, Randall asked P several questions in Randall's vehicle. According to Randall, those questions were "two-pronged": some of the questions could aid in identifying who P was, but other questions were aiding Randall in determining whether P was "involved in some type of criminal activity." Those questions included how long had P lived in the United States, where he was currently living, where he was coming from, where he was going, who he was traveling with, what they were going to do when they got to their destination, what they had brought with them from California, the address of where he was going to stay, and the name and contact information of the person he was staying with. P answered all of Randall's questions, explaining that they were from California, and they were driving to Washington to look for work. Although P provided Randall with the contact information of the person whom they were meeting, Randall did not attempt to contact that person to confirm P's identity. At 9:04 a.m., fifteen minutes into the conversation, Randall specifically asked P if there were drugs in the car, if everything in the car belonged to him, and for his consent to search the car for drugs.

Meanwhile, a second trooper, Smith, arrived at the scene. Smith initially joined Randall's conversation with P and learned that P did not have a license. Smith then walked to defendant, who was still in the front passenger seat, at about 8:51 a,m., and began questioning him in a mixture of Spanish and English. Smith asked defendant if he had a license or identification, and defendant responded in Spanish. Smith, in response to defendant, said, "Muy

poquito español," which means "Very little Spanish," indicating that Smith spoke and understood very little Spanish. Nevertheless, Smith asked defendant, in Spanish, to write his full name and date of birth on a notepad. At 8:53 a.m., Smith also asked defendant what P's name was, what their relationship was, where they lived, where they were going, how long they were going to be at their destination, and who they were going to visit. Defendant responded to Smith's questions in Spanish, which Smith understood to mean that defendant and P were driving to visit family in Portland. At 8:54 a.m., Smith then said, "Un momento," and left defendant in the car to go to his car.

At 9:09 a.m., Randall instructed P to stand at the front of his patrol car. Randall then walked to Smith's patrol car, where Smith had been waiting, to confer. Smith informed him that defendant said they were headed to Portland to visit family. Randall testified that, based on this information, he believed that he now had reasonable suspicion that defendant "was aiding the driver in the Possession and Delivery of Controlled Substances" because of the inconsistencies between P and defendant's stories.

Meanwhile, P and defendant ran. Randall pursued the pair and took them into custody. After defendant was handcuffed, he was searched. He had two cell phones in his pants' pockets which the troopers seized. A search of the vehicle uncovered a large amount of fentanyl.

P and defendant elected to be tried together. Prior to trial, defendant moved to suppress all evidence obtained from the stop, including searches of defendant, searches of defendant's property, and statements made by defendant. Defendant argued that he was seized when Smith approached him, the seizure was unlawfully extended by Smith asking defendant questions unrelated to the reason for the stop, and Randall extending the traffic stop "temporally, via his unrelated questioning of [P]." The state argued, in the main, that defendant was not stopped and, in any event, the questions to defendant were merely "to determine if [defendant] was a valid driver and to help identify [P]." The trial court denied defendant's motion, finding that the troopers had reasonable suspicion of a drug crime. With

regard to defendant, the trial court found that he was not stopped at any point. Defendant and P were tried together to a jury and found guilty. This appeal followed.

On appeal, defendant renews his challenges to the legality of the seizure. Specifically, defendant argues that he was seized—either because of the initial traffic stop, or because of the subsequent statements and actions by Smith and Randall—and that the troopers unlawfully extended the duration of the traffic stop by asking him and P questions unrelated to the reasons for the stop. The state argues that defendant, as the passenger of a vehicle, was not seized for purposes of Article I, section 9, of the Oregon Constitution during the traffic stop, and that, in any event, the troopers did not unlawfully extend the duration of the traffic stop because the troopers' questions were reasonably related to ascertaining P's identity (or were formed after troopers developed reasonable suspicion of a drug crime from P's and defendant's responses).

Article I, section 9, provides that the people have the right "to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]" A seizure occurs "when (1) a police officer intentionally and significantly interferes with an individual's liberty or freedom of movement; or (2) a reasonable person, under the totality of the circumstances, would believe that his or her liberty or freedom of movement has been significantly restricted." *State v. Arreola-Botello*, 365 Or 695, 701, 451 P3d 939 (2019). "[S]omething more than just asking a question, requesting information, or seeking an individual's cooperation is required," as mere requests where "the officer does no more than seek the individual's cooperation through noncoercive questioning and conduct" do not implicate Article I, section 9. *State v. Backstrand*, 354 Or 392, 403, 417, 313 P3d 1084 (2013).

In determining whether a verbal encounter, such as the conversation between the police and defendant, rises to the level of a seizure, we look to factors such as "the content of the questions, the manner of asking them, or other actions that the police take (along with the circumstances in which they take them)" and whether they would convey

"to a reasonable person that the police are exercising their authority to coercively detain the citizen." *State v. Reyes-Herrera*, 369 Or 54, 58, 500 P3d 1 (2021) (internal quotation marks omitted). "[W]hether a person is seized for purposes of Article I, section 9, requires a fact-specific inquiry into the totality of the circumstances of the particular case," *State v. Amaya*, 336 Or 616, 629, 89 P3d 1163 (2004) (internal quotation marks omitted), and we consider "all of an officer's actions as a whole greater than the sum of its parts." *State v. Kuehne*, 300 Or App 698, 702, 454 P3d 797 (2019), *rev den*, 366 Or 493 (2020) (internal quotation marks omitted).

When determining if a traffic stop converts to a seizure under Article I, section 9, however, there are additional considerations.[3] In general, stopping the driver of a car does not constitute a seizure of the passengers for the purposes of Article I, section 9. *State v. Stevens*, 364 Or 91, 100, 430 P3d 1059 (2018). That is because, theoretically, "the passengers in a car stopped for a traffic or criminal offense would not understand that the officer's show of authority in stopping the driver extended to them." *State v. Payne*, 310 Or App 672, 678, 487 P3d 413, *rev den*, 368 Or 514 (2021) (internal quotation marks omitted). Instead, some *further* show of authority must extend to or be directed at the passenger specifically, such that a reasonable person would understand that "the officer was independently restricting their movement apart from the stop of the driver." *Id.* at 679. To determine whether police extended that further show of authority to a passenger, we look to the totality of the circumstances. *State v. Allen*, 314 Or App 735, 738-39, 497 P3d 777 (2021). In so doing, we examine relevant factors such as (1) the physical acts or instructions by the officers that communicate to a passenger that they should remain, (2) "the manner of the stop," (3) and "the type of questions" asked of the passenger. *Payne*, 310 Or App at 679.

---

[3] Under the Fourth Amendment to the United States Constitution, "a police officer effectively seizes 'everyone in the vehicle,' the driver and all passengers" "for the duration of a traffic stop." *State v. Bailey*, 356 Or 486, 507, 338 P3d 702 (2014) (quoting *Arizona v. Johnson*, 555 US 323, 327, 129 S Ct 781, 172 L Ed 2d 694 (2009); *Brendlin v. California*, 551 US 249, 255, 127 S Ct 2400, 168 L Ed 2d 132 (2007)). Since our method of constitutional interpretation requires us to examine our state constitution first, *Sterling v. Cupp*, 290 Or 611, 614, 625 P2d 123 (1981), and we conclude that defendant's rights were violated under the state constitution, we need not determine whether the Fourth Amendment would also require suppression.

Applying those principles here, we conclude that, under the totality of the circumstances, defendant was seized, at the latest, at 8:53 a.m., when Smith's questions changed from general questions about defendant's or P's identity, to more probing questions about what defendant and P's plans were. Put differently, at that point, a reasonable person in defendant's situation would have felt that their movement was restricted by Smith. Several factors lead us to that conclusion.

Turning first to the "physical acts or instructions" of the troopers, we consider whether the trooper communicated that defendant was not free to leave. Here, Randall had already indicated to defendant—through Randall's words and "physical acts"—that defendant should remain in the car while Randall questioned P. Although Randall did not explicitly tell defendant he was not free to go, he did tell defendant to wait inside the car while he talked to P. Randall also approached the vehicle from the passenger side, speaking over defendant to talk with P, before addressing defendant. *See Allen*, 314 Or App at 739 (police officers instructing the occupants of a vehicle to stay in the vehicle combined with the act of coming up to the passenger side of the vehicle when another officer approached the driver side communicated to the defendant that the officer's authority extended to him); *State v. Soto-Navarro*, 309 Or App 218, 227, 482 P3d 150 (2019) (officer seized the defendant-passenger when he instructed her to keep her hands where he could see them). A reasonable person in defendant's position would have likely interpreted the troopers' actions to mean that he needed to wait until police gave him permission to exit the vehicle. *See State v. Benning*, 273 Or App 183, 193-94, 359 P3d 357 (2015) (communicating to the defendant that the person should "hang on there, or hang on a second," while police went to check identification "would have communicated to a reasonable person that the person was not free to terminate the encounter or decline").

In addition, the "manner" of the traffic stop, including its location, also communicated to defendant that he was not free to leave. Location here matters: a passenger may feel freer to leave when in a vehicle that is pulled over in a

familiar neighborhood, or a place with other people walking nearby. By contrast, a passenger in a vehicle that is pulled over in a rural area, or in the dead of night, or the side of a major interstate, may feel more compelled to stay, for any number of reasons—most obviously, personal and physical safety. *See State v. Prouty*, 312 Or App 495, 502, 492 P3d 734 (2021) (noting that, "[a]lthough our analytical focus is primarily on the troopers' conduct, the location and timing of the encounter provide context in determining the coerciveness of the conduct at issue"); *State v. Newton*, 286 Or App 274, 281-82, 398 P3d 390 (2017) (while "location does not, of itself, convert an otherwise lawful encounter to a seizure," it still has "some bearing" in the analysis); *see also Stevens*, 364 Or at 101 (passenger walking away from vehicle pulled over on public highway was seized, "if not before," then at the point when officers questions became more coercive and told passenger she could be in trouble with her parole officer if she were lying).

Here, police pulled over defendant's vehicle on the shoulder of a busy highway, separated defendant from P, and questioned P for nearly 20 minutes. Defendant was not in a place where he could safely walk away from the situation, defendant could not drive the vehicle, and defendant was reliant on P for transportation. Indeed, Randall testified that he brought P into his vehicle because he was on the shoulder of a busy interstate and traffic made it "extremely noisy." *See Prouty*, 312 Or App at 502 (passenger in vehicle pulled over on median of I-5 "such that there was highway traffic on either side of defendant and the troopers" seized, in part, because "there was no safe passage across the freeway because traffic was heavy"). Under those circumstances, a reasonable person in defendant's position would not have felt like they could just walk away.

In addition, police questioned P—in view of defendant—in a police vehicle. A reasonable person in defendant's position would think that they were required to cooperate with police, lest they be detained as well.

Moreover, the "type[s] of questions" that Smith asked defendant gave defendant the impression that he was being investigated for a crime and was unable to leave

lawfully. While certain innocuous questions, such as asking a passenger to identify themselves, will never rise to the level of a seizure, other, more coercive questions, can effectively seize a passenger who has little option but to stay and answer them. *Compare Backstrand*, 354 Or at 410 (passenger not seized when officers merely asked them to confirm driver's identity), *with Stevens*, 364 Or at 94-95, 101 (passenger seized when officers told her she could be in trouble with her parole officer if she did not identify the driver accurately). Although Smith began by asking basic identification questions of defendant (who, as the nondriver, had not committed any traffic violation and was not under reasonable suspicion of *any* criminal activity), the questions continued to become more probing, as he asked defendant where he was traveling to, how long he was going to be at his destination, and who he was going to visit. Rather than constituting "[a] mere request for identification," *Backstrand*, 354 Or at 410, the questions became more personal to defendant (and unrelated to P's identity), reflecting a suspicion that *defendant* might have done something wrong. *See Stevens*, 364 Or at 101 (increasingly coercive questions of the passenger-defendant to identify another passenger supported a conclusion that the passenger was seized when she "became enmeshed in [the officer's] extended inquiry" of another passenger).[4]

In many ways, this case is analogous to *Stevens*, where the Supreme Court concluded that a passenger in a traffic stop was seized. In *Stevens*, the defendant was one of three passengers in a van that was pulled over on a public highway because one of its headlights was out. After helping police ascertain the identity of another passenger, the defendant got out of the van and began walking off. *Id.* at 95. The officer then asked the defendant if he could search

---

[4] In addition, we are mindful of the fact that Smith approached defendant and began speaking to him in English, a language that defendant had challenges communicating in. Smith was aware that defendant spoke Spanish, yet did not stop to find a translator, or ensure that defendant could understand him. Given the language barrier, defendant might not have understood Smith's instruction for him to remain in the vehicle as anything but an order not to leave. *See Commonwealth v. Burgos*, 223 Pa Super 325, 331, 299 A2d 34, 38 (1972) (reasoning that coercion may be present when police interact with a person who does not understand English well because "a person without a facility in the English language might understand a request, however phrased, to be an order and thus merely acquiesce, rather than voluntarily consent to the request").

her backpack, which uncovered illegal drugs. *Id.* The state argued that defendant could not have been seized, because, by walking off, she understood that she was free to leave. *Id.* at 102-03. The Supreme Court, however, disagreed, noting that the police officer's continuing to question the defendant, and ask for her consent to search, thus effectively stopping her when she was trying to leave, "communicated that she was not free to go." *Id.* at 103. Here, too, defendant attempted to leave by running away from police. The police chased defendant and P down with tasers, ordered them both to stop, and ultimately handcuffed them. Those circumstances strongly imply, like in *Stevens*, that defendant was not actually free to go prior to leaving. *See id.* ("Whatever might be inferred from defendant's incipient effort to walk off, [the officer] did not let her go.").

Although not every factor here bears strongly on a seizure, ultimately, each factor contributes to a whole that is "greater than the sum of its parts" and leads us to conclude that defendant, as a passenger who was told to remain in his vehicle and had no reasonable way of leaving the scene, was seized, at the latest, at the point that the trooper's questions went beyond the scope of identification. Thus, on balance, defendant was seized for the purposes of Article I, section 9.

The inquiry of whether and when a passenger is seized, under Article I, section 9, is only the tip of the iceberg. We next must consider whether defendant was seized *unlawfully*. *See Payne*, 310 Or App at 681 ("Now that we know when defendant was seized—when the car in which he was a passenger was stopped—we must next consider whether such a seizure was lawful."). When determining whether a seizure is lawful, our touchstone is reasonableness. *See State v. Fair*, 353 Or 588, 602, 302 P3d 417 (2013) (the "touchstone" of the state and federal constitutional limitations on searches and seizures is "reasonableness"). In the context of a traffic stop, "[o]fficers investigating a traffic infraction cannot engage in investigative activities * * * that are unrelated to that infraction, unless those activities have an independent constitutional justification, such as reasonable suspicion of another crime." *State v. Wicks*, 332 Or App 67, 69, 549 P3d 49 (2024) (internal quotation

marks omitted). An officer has reasonable suspicion if they "can point to specific and articulable facts that give rise to a reasonable inference that the defendant committed or was about to commit a specific crime or type of crime." *State v. Maciel-Figueroa*, 361 Or 163, 165, 389 P3d 1121 (2017).

Having probable cause of a traffic offense is not carte blanche to conduct an investigation; rather officers may ask questions related only to the justification for the stop, and officers cannot extend the stop temporally. *Arreola-Botello*, 365 Or at 712. Specifically, "for the purposes of Article I, section 9, *all* investigative activities, including investigative inquiries, conducted during a traffic stop are part of an ongoing seizure and are subject to both subject-matter and durational limitations." *Id.* (emphasis added). Indeed, "[i]t is the justification for the stop that delineates its lawful bounds," and by "applying subject-matter limitations to investigative activities and questioning, Article I, section 9, ensures that officers do not turn minor traffic violations into criminal investigations ***." *Id.* at 712 n 7, 713.

Moreover, those subject-matter and durational limitations apply to the seizure of a passenger as well. *Soto-Navarro*, 309 Or App at 229-30. For example, in *Soto-Navarro*, the defendant was a passenger in a vehicle that had been pulled over following two traffic violations. *Id.* at 220-21. After pulling over the vehicle, two police officers who were armed and in uniform left their patrol car with flashing overhead lights and flanked the vehicle on either side. *Id.* at 221. One officer told the defendant, "[K]eep your hands where I can see them." *Id.* The two officers spoke with the driver and the defendant, obtaining their names. *Id.* Within 30 seconds of the start of the stop, a third officer and a drug-sniffing dog circled the vehicle, where the dog alerted them to drugs. *Id.* On review of the denial of the defendant's motion to suppress, we held that, although the defendant was not automatically seized by virtue of being a passenger in the vehicle, she was seized "at the very latest" when the officer told her to keep her hands where he could see them. *Id.* at 227. We further concluded that the *defendant's* seizure was unlawfully extended by the use of the drug-sniffing

dog, because it was unrelated to the justification for seizing defendant in the context of the traffic stop:

> "Consequently, because the only plausible justification for seizing defendant in the context of the traffic stop was to ensure the safe and lawful processing of it, when [the drug-sniffing dog's] sniff extended the traffic stop in violation of the subject-matter limitations recognized in *Arreola-Botello*, it also unlawfully extended the related ancillary seizure of defendant. Defendant's own rights under Article I, section 9, were violated by that unlawful extension, so her motion to suppress must be granted."

*Id.* at 229-30.

The facts of this case are analogous to *Soto-Navarro*. Just like in *Soto-Navarro*, defendant here was seized in the context of a traffic stop to ensure the safe and lawful processing of the stop—namely, to assist in ascertaining P's identity. And just like in *Soto-Navarro*, police investigation unrelated to the justification for the traffic stop extended the stop in violation of the subject-matter limitations recognized in *Arreola-Botello*. It does not matter if the investigation consisted of a dog sniffing for drugs in the vehicle, as in *Soto-Navarro*, or of additional, unrelated questioning of P designed to discover drugs in the vehicle. In both instances, the effect is the same: the unlawful subject-matter and temporal extension of the stop of a passenger.

The timing of the incident further supports our conclusion that defendant's seizure was unlawfully extended. Randall testified that he did not develop reasonable suspicion that defendant was involved in a drug crime until his conversation with Smith at 9:09 a.m. But at 8:52 a.m., Randall had all of the information that he needed to complete his investigation of P's traffic violations: He had P's name and address, a valid license plate number, verified vehicle ownership and registration information, and he knew that defendant also did not have a driver's license. Randall and Smith thus extended defendant's stop for nearly fifteen minutes, without any reasonable suspicion whatsoever. Their questions and actions subsequent to 8:52 a.m. served only to extend the traffic stop for the purpose of obtaining sufficient information to justify a search for drugs.

The trial court erred in denying defendant's motion to suppress because defendant's own rights under Article I, section 9, were violated by that unlawful extension.

Reversed and remanded.